[No. H023199. Sixth Dist. Mar. 26, 2002.]

Estate of DERREL DEPASSE, Deceased.
JOHN DEPASSE, as Executor, etc., Petitioner and Respondent, v.
JACK HARRIS, Objector and Appellant.

**COUNSEL**

Richard I. Wideman for Objector and Appellant.

Boskovich, Gorini & Vanasse and Richard A. Gorini for Petitioner and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, Acting P. J.**—Jack Harris appeals from an order in a probate proceeding denying his spousal property petition. Harris and the decedent, Derrel DePasse, had lived together. DePasse became terminally ill and was hospitalized. The day before she died, the hospital chaplain performed a marriage ceremony for Harris and DePasse. Although aware that a marriage license was required, the parties did not obtain a license because of DePasse's illness and imminent death.

Two days before the marriage ceremony, DePasse had executed a will naming her brother executor of her estate. Harris filed a spousal property petition in the probate action claiming a one-half interest in DePasse's estate as her surviving spouse. The executor challenged Harris's petition on the ground that the marriage was not valid because the parties had not obtained a marriage license. The trial court found that a license was a prerequisite for a valid marriage in California and that Harris was not entitled to inherit as a putative spouse and denied his spousal property petition.

On appeal, Harris asserts that the failure to obtain a marriage license before the ceremony is a curable defect that does not invalidate the marriage. Based upon the statutes governing marriage, we conclude that the issuance of a license is a mandatory requirement for a valid marriage in California. We also hold that Harris's petition to establish the fact of marriage pursuant to Health and Safety Code section 103450 did not cure his failure to obtain a license. Finally, we conclude that the trial court was correct in finding that Harris was not a putative spouse because he did not have an objectively reasonable, good faith belief that he was lawfully married. We will therefore affirm the trial court order denying Harris's spousal property petition.

## I. FACTUAL BACKGROUND

Derrel DePasse was hospitalized at Stanford University Medical Center with a terminal illness. The date she was hospitalized and the nature of her illness are not disclosed in the record. Prior to her hospitalization, DePasse had resided with Jack Harris in his home in Saratoga, California. The record does not indicate how long the couple lived together.

At the time she was hospitalized, DePasse owned a sizable estate consisting of over $4.5 million in liquid assets, 50 pieces of artwork worth $500,000 to $800,000, plus furniture, books, jewelry, household goods and other items of personal property. Except for some of the artwork, which was on loan for public display in the community, DePasse's artwork, books, furnishings, jewelry, and other items of personal property were located in Harris's home.

On July 5, 2000, while in the hospital, DePasse executed a holographic will appointing her brother, John DePasse, executor of her estate and instructing him to donate all of her artwork to one of three museums, either the American Museum of Folk Art in New York City, the National Museum of American Art in Washington, D.C., or the Philadelphia Art Institute. De-Passe also instructed her brother to "[s]et up endowment funds for two museums for twentieth century American folk art." The amounts of money

to be contributed to the endowment funds were not specified in the will. The will also provided that the donations be completed within 90 days of DePasse's death and that none of her artwork be removed from her collection. The will did not mention Harris.

On July 7, 2000, two days after DePasse executed the holographic will, she and Harris asked the hospital chaplain to perform a marriage ceremony for them. According to the chaplain, both DePasse and Harris told her that they wanted to be married before DePasse died and that there was no time for them to obtain a marriage license. The chaplain performed the marriage ceremony at Stanford University Medical Center. According to Harris, the couple had planned to be married in a large ceremony in late 2000 or in 2001.

DePasse died the day after the marriage ceremony. She was 52 years old. She is survived by her brother, John DePasse; her mother, Josephine DePasse; and Jack Harris.

## II. PROCEDURAL HISTORY

On July 25, 2000, John DePasse filed a petition for probate and letters testamentary. The petition asserted that Derrel DePasse[1] had no spouse or children.

On January 4, 2001, almost six months after the marriage ceremony, Harris filed an ex parte petition for an order establishing the fact, time and place of marriage pursuant to Health and Safety Code section 103450 (hereafter section 103450).[2] The petition was filed as a separate action, in another department of the court. Copies of the petition were not served on any of the parties to the probate action. In his petition, Harris asserted that "[d]ue to Derrel's death shortly thereafter, the parties did not obtain a license or otherwise record the marriage. The Chaplin [sic] neglected to provide a certificate of marriage under Fam. Code, § 424." Harris also advised the court that "[t]here is no prejudice to anyone because this ex parte procedure has no evidentiary effect. [Schmidt v. Retirement Board (1995)] 37

[1]Hereafter, for ease of reference we shall refer to Derrel DePasse as DePasse and John DePasse as the executor.

[2]Section 103450 provides: "A verified petition may be filed by any beneficially interested person with the county clerk of the superior court in and for (a) the county in which the birth, death or marriage is alleged to have occurred, or (b) the county of residence of the person whose birth or marriage it is sought to establish, or (c) the county in which the person was domiciled at the date of death, if the person has died, for an order to judicially establish the fact of, and the time and place of a birth, death or marriage that is not registered or for which a certified copy is not obtainable."

Cal.App.4th [1204,] 1216 [44 Cal.Rptr.2d 297] ('no evidentiary weight whatsoever')." On January 16, 2001, the court signed a form order that had been prepared by Harris establishing the fact of the marriage.

That same day, the executor filed a petition in the probate action to establish the estate's claim of ownership to DePasse's property and for an order directing transfer of the property to the estate. On January 22, 2001, Harris filed a petition to determine ownership of the estate property and his spousal intestate rights and for an order directing the transfer of the property to Harris. In that petition, he asserted that DePasse had given him several items of personal property as gifts prior to their marriage, including four paintings, 13 sketches, a piece of china, some jewelry and one-half of her books. Harris also filed a spousal property petition in which he claimed one half of all of the assets of the probate estate as DePasse's surviving spouse.

On March 6, 2001, Harris filed an amended petition to determine ownership of the estate property and his spousal intestate rights and for an order directing transfer of the property (hereafter the amended petition). In the amended petition, Harris claimed that, in addition to the items listed in his first petition, DePasse had given him all of the furniture and furnishings located at his residence as gifts prior to their marriage. The amended petition contained a detailed, room-by-room listing of the furniture and personal property Harris claimed as gifts. Harris also continued to claim a one-half interest in all of the other assets of the probate estate as DePasse's surviving spouse.

On March 27, 2001, the executor objected to Harris's spousal property petition and Harris's amended petition on the grounds that Harris was not legally married to DePasse because the parties had never obtained a marriage license. The executor also asserted that the chaplain had committed a misdemeanor by solemnizing the marriage without a license in violation of Penal Code section 360 and that DePasse did not have the capacity to marry under Probate Code section 812.[3]

A hearing was held on Harris's spousal property petition on March 29, 2001. The issue of the legality of the marriage was argued and submitted.

---

[3]Probate Code section 812 provides: "Except where otherwise provided by law, including, but not limited to, Section 813 and the statutory and decisional law of testamentary capacity, a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant, all of the following: [¶] (a) The rights, duties, and responsibilities created by, or affected by the decision. [¶] (b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision. [¶] (c) The significant risks, benefits, and reasonable alternatives involved in the decision."

Both sides were also allowed to submit supplemental briefs on the issue. Harris's supplemental brief argued that the court's order establishing the fact of marriage cured the parties' failure to obtain a license. He also asserted that the marriage statutes permit a marriage to be registered after the fact. In addition, he contended that he could inherit as a putative spouse. The executor's supplemental brief reviewed the statutory scheme governing marriage and argued that the issuance of a license was essential to a valid marriage. The executor also argued that creating a statistical record of an invalid marriage pursuant to section 103450 does not validate the marriage. Finally, the executor asserted that the putative spouse claim was not properly alleged and was not before the court.

On April 27, 2001, the trial court issued an order denying Harris's spousal property petition. The court found that "California requires a marriage license as a prerequisite to marriage." The court also found that nothing in the statutory scheme permits the use of the procedure in section 103450 to validate a marriage if the parties never obtained a marriage license. The court also reached the merits of Harris's putative spouse claim and found that Harris's assertion of putative spouse status did not rest on facts that would cause a reasonable person to harbor a good faith belief that the marriage was lawful because he lacked a marriage license. The court found that Harris's subjective belief, even if honestly held, did not constitute good faith. The court concluded that the estate had overcome the rebuttable presumption in favor of finding a valid marriage. Harris's claim that certain items of property belonged to him as gifts was reserved for hearing at a later date. Harris appeals from the order denying his spousal property petition.

III. STANDARD OF REVIEW

Harris admits that he and DePasse did not have a marriage license when the chaplain conducted the marriage ceremony. In addition, neither the parties nor the chaplain made any effort to obtain a license after the ceremony. Harris does not claim that a license was not required. He asserts instead that his failure to obtain a license was a curable defect that did not invalidate the marriage. Harris's only attempt to cure the lack of a license was the filing of the ex parte petition to establish the fact of marriage pursuant to section 103450.

Harris's arguments require us to determine, as a matter of law, whether a marriage license is required for a valid marriage and whether Harris's section 103450 petition cured the parties' failure to obtain a license in this case. ██ Matters presenting pure questions of law, not involving the resolution of disputed facts, are subject to the appellate court's independent

review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) Our analysis requires us to review and interpret the statutes governing marriage. Appellate courts independently determine the proper interpretation of a statute. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

## IV. DISCUSSION

■ The state has a vital interest in the institution of marriage and plenary power to fix the conditions under which the marital status may be created or terminated. (*In re Marriage of Walton* (1972) 28 Cal.App.3d 108, 113 [104 Cal.Rptr. 472].) The regulation of marriage is solely within the province of the Legislature. (*Beeler v. Beeler* (1954) 124 Cal.App.2d 679, 682 [268 P.2d 1074].) In view of the Legislature's role in regulating marriage, we begin by reviewing the statutes governing marriage in California.

### A. *Review of Statutes Governing Marriage in California*

Family Code section 300[4] provides: "Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary. Consent alone does not constitute marriage. *Consent must be followed by the issuance of a license* and solemnization as authorized by this division,[5] except as provided by Section 425[6] and Part 4[7] (commencing with Section 500)." (Italics added.)

Section 306 provides: "Except as provided in Section 307[8], *a marriage shall be licensed,* solemnized, and authenticated, and the certificate of registry of marriage shall be returned as provided in this part.[9] Noncompliance with this part by a nonparty to the marriage does not invalidate the marriage." (Italics added.)

---

[4]Unless otherwise stated all further statutory references are to the Family Code.

[5]The phrase "this division" in section 300 refers to division 3 of the Family Code, which governs marriage and includes sections 300 through 536.

[6]Section 425 is discussed in detail in part IV.C. of this opinion.

[7]Part 4 of division 3 of the Family Code (§§ 500-536) governs confidential marriages. Harris does not allege that he and DePasse entered into a confidential marriage.

[8]A priest, minister, or rabbi of any religious denomination may solemnize a marriage. (§ 400.) Section 307 provides special procedural rules regarding the solemnization of marriage for persons who are members of religious societies or denominations that do not have clergy for the purpose of solemnizing a marriage. Section 307 does not apply here since an interfaith chaplain performed the marriage ceremony.

[9]The phrase "this part" in section 306 refers to part 1 of division 3 of the Family Code, which governs the validity of marriage and includes sections 300 through 310.

Section 350 provides: "Before entering a marriage, or declaring a marriage pursuant to Section 425, the parties *shall first obtain a marriage license from a county clerk.*" (Italics added.) The marriage license shall show the parties' identities, real and full names, places of residence, and ages. (§ 351.) The applicants may be required to present identification and the clerk may examine them under oath or request additional documentary proof as to the facts stated. (§ 354.) A marriage license shall not be granted if either of the applicants lacks the capacity to enter into a valid marriage or is under the influence of alcohol or drugs at the time he or she applies for the license. (§ 352.) A marriage license expires 90 days after it is issued. (§ 356.)

Section 421 provides: *"Before solemnizing a marriage, the person solemnizing the marriage shall require the presentation of the marriage license.* If the person solemnizing the marriage has reason to doubt the correctness of the statement of facts in the marriage license, the person must be satisfied as to the correctness of the statement of facts before solemnizing the marriage. For this purpose, the person may administer oaths and examine the parties and witnesses in the same manner as the county clerk does before issuing the license." (Italics added.) Penal Code section 360 provides that every person who solemnizes a marriage "without first being presented with the marriage license, as required by Section 421" is guilty of a misdemeanor.

Section 359 contains the procedures for completion of the certificate of registry of marriage. At the time of the marriage ceremony here, section 359 provided in relevant part: "(a) Applicants for a marriage license shall obtain from the county clerk issuing the license, a certificate of registry of marriage. [¶] . . . [¶] (c) The certificate of registry shall be filled out by the applicants, in the presence of the county clerk issuing the marriage license, and shall be presented to the person solemnizing the marriage. [¶] (d) The person solemnizing the marriage shall complete the certificate of registry and shall cause to be entered on the certificate of registry the signature and address of one witness to the marriage ceremony. [¶] (e) The certificate of registry shall be returned by the person solemnizing the marriage to the county recorder of the county in which the license was issued within 30[10] days after the ceremony. [¶] (f) As used in this division, 'returned' means presented to the appropriate person in person, or postmarked, before the expiration of the specified time period." Section 422 lists the information that is to be added to the certificate of registry by the person solemnizing the marriage. Section 423 reiterates the requirement that the person solemnizing the marriage return the marriage license, along with the certificate of registry, to the county recorder.

[10]Section 359 was amended in 2001. (Stats. 2001, ch. 39, § 2.) Pursuant to the amendment, the time for return of the certificate of registry has been shortened to 10 days.

The information to be contained on the certificate of registry of marriage is prescribed by section 422 and by section 103175 of the Health and Safety Code. (§ 359, subd. (b).) "The forms for the application for license to marry, certificate of registry of marriage including the license to marry, and the marriage certificate shall be prescribed by the State Registrar." (Health & Saf. Code, § 103125.) Currently and at the time of marriage ceremony in this case, a single form entitled License and Certificate of Marriage, State of California, Department of Health Services, Office of State Registrar form VS-117, serves as the combined application for the marriage license, the license to marry and certificate of registry of marriage. (1 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2001) Validity of Marriage, § 10.00, pp. 10-80 to 10-82 (Kirkland).) On form VS-117, the county clerk authorizes the person conducting the marriage ceremony to solemnize the marriage.

According to the statutory scheme, there are five steps in the marriage process. First, the parties must consent. Second, the parties must obtain a license from the county clerk. Since the license and certificate of registry are combined into one form, the parties also obtain the certificate of registry at that time. Third, the marriage must be solemnized. Before solemnizing the marriage, the person conducting the ceremony must ensure that the parties have obtained a marriage license. Fourth, the person solemnizing the marriage must authenticate the marriage by signing the certificate of registry and arranging for at least one witness to sign the certificate. Finally, the person solemnizing the marriage must return the certificate of registry to the county clerk for filing.

In this case, although the executor raised the issue of DePasse's capacity to consent in his objections to Harris's spousal property petition, that issue was not adjudicated in the hearing on the petition and is not before us on this appeal. As to the other four requirements for a valid marriage, Harris admits that he never obtained a marriage license. The chaplain performed a marriage ceremony knowing the parties did not have a license in violation of section 421, subjecting herself to prosecution for a misdemeanor pursuant to Penal Code section 360. Since the parties did not obtain a license, they also failed to obtain the certificate of registry of marriage required by section 359. The chaplain did not fill out or sign a certificate of registry and there is no evidence that anyone other than the chaplain and the parties witnessed the ceremony. Finally, the chaplain failed to return a certificate of registry to the county clerk.

B. *Mandatory Nature of Licensing Requirement in California*

In some jurisdictions, a marriage will be deemed valid even though no license was obtained where the statutes providing for the procurement of a

license are viewed as directory rather than mandatory. (52 Am.Jur.2d (2000) Marriage, § 32, p. 751; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Husband & Wife, § 40, p. 60.) Other jurisdictions view the licensing requirement as mandatory and hold that the absence of a license is a fatal flaw to the validity of a marriage. (52 Am.Jur.2d, *supra*, § 32, pp. 751-752, citing among others *Nelson v. Marshall* (Mo.Ct.App. 1993) 869 S.W.2d 132 (*Nelson*).) The California courts have never authoritatively determined whether a license is an absolute requirement for a valid marriage. (11 Witkin, *supra*, § 40, p. 60, citing *In re Estate of Shipp* (1914) 168 Cal. 640, 642 [144 P. 143] and *Norman v. Norman* (1898) 121 Cal. 620, 629 [54 P. 143].) However, the Legislature addressed the issue in 1945 by amending former Civil Code section 55 (now Fam. Code, § 300) to provide that the parties' consent to marriage "must be followed by the issuance of a license." (Compare Stats. 1895, ch. 129, § 1, p. 121 with Stats. 1945, ch. 213, § 1, p. 684; see Historical and Statutory Notes, 29C West's Ann. Fam. Code (1994 ed.) foll. § 300, p. 99.) Other statutory provisions governing marriage reinforce the mandatory nature of the licensing requirement in California. Section 306 provides that "a marriage shall be licensed." Section 350 provides that "[b]efore entering a marriage, . . . the parties shall first obtain a marriage license" and section 421 provides that the person solemnizing the marriage "shall require the presentation of the marriage license."

██ We are cognizant of the fact that our courts have held that the use of the word "must" in a statute "does not necessarily and *ipso facto* make statutory provisions mandatory." (*Argonaut Ins. Co. v. Industrial Acc. Com.* (1962) 204 Cal.App.2d 805, 810 [23 Cal.Rptr. 1] (*Argonaut*).) Likewise the word "shall" has been held in some cases to be merely directory. (*Estate of Mitchell* (1942) 20 Cal.2d 48, 51 [123 P.2d 503].) Whether the words "must" or "shall" should be construed as mandatory or directory depends on the intention of the Legislature in enacting the particular code section. (*Ibid.*; *Argonaut, supra,* 204 Cal.App.2d at p. 810.) ██ In 1992 the Legislature reorganized the major family law statutes into a new code, entitled the Family Code. (Stats. 1992, ch. 162, §§ 1-10, p. 464.) The new code specifically addressed the question of whether the term "shall" is directory or mandatory. Section 12 provides that the use of the term "shall" in the Family Code indicates that the required action is mandatory. (§§ 6, 12.) Sections 306, 350, and 421 all employ the word "shall." Thus according to the plain language of the statutes, a license is a mandatory requirement for a valid marriage in California.

In finding that a license is required for a valid marriage, the trial court relied on *Nelson, supra,* 869 S.W.2d 132, a case which is factually very similar to this case. The man and woman in *Nelson* had lived together for 12

years. The man took ill and was hospitalized. The woman asked the hospital chaplain to determine how they could marry. The chaplain called the county recorder and was told that a judge would have to waive the usual three-day waiting period after issuance of a marriage license. The chaplain concluded that the waiver would be difficult to obtain, because it was a holiday. The chaplain performed the marriage ceremony in the hospital and told the couple they would have to sign the application forms for a marriage license. The parties did not sign the forms. The man died the day after the ceremony. A marriage license was never obtained. The Missouri statute contained a mandatory licensing provision. The court concluded that the statute was unambiguous and that the plain language of the statute required a license for a valid marriage contract. The court observed that one of the purposes of the licensing requirement in Missouri was to eliminate common law marriages. The California statutes, like those in Missouri, contain mandatory language requiring the issuance of a license for a valid marriage. In addition, California, like Missouri, has abolished common law marriages. (*Norman v. Norman, supra,* 121 Cal. at p. 628 ["Prior to 1895 section 75 of the Civil Code provided for marriages by declaration without the solemnization required by section 70, but the act of March 26, 1895, swept away that easy process of marriage."].) We conclude, as the court did in *Nelson,* that a license is a mandatory requirement for a valid marriage in California.

Harris's reliance on *Maxwell v. Maxwell* (1966) 51 Misc.2d 687 [273 N.Y.S.2d 728] (*Maxwell*) is misplaced. The court in *Maxwell* was interpreting former Civil Code section 69, a predecessor to section 350. (Stats. 1969, ch. 1608, § 3, p. 3313 [repealing Civ. Code, § 69]; Stats. 1969, ch. 1608, § 8, p. 3314 [enacting Civ. Code, § 4201]; Stats 1992, ch. 162, § 3, p. 464 [repealing Civ. Code, § 4201]; Stats. 1992, ch. 162, § 10, p. 464 [enacting Fam. Code, § 350].) Former Civil Code section 69 provided that the parties "must" obtain a license before marrying. The *Maxwell* court construed the language of former section 69 as directory, citing *Argonaut, supra,* 204 Cal.App.2d 805. (*Maxwell, supra,* 273 N.Y.S.2d at pp. 729-730.) The Legislature amended and/or renumbered former Civil Code section 69 several times after *Maxwell* was decided. (Historical and Statutory Notes, 29C West's Ann. Fam. Code, *supra,* foll. § 350, p. 125.) Section 350, the current successor to former Civil Code section 69, provides that the parties to a marriage "shall first obtain a marriage license" and section 12 provides that the word "shall" is mandatory. *Maxwell* did not discuss any other California statutes and applied New York law in the balance of its analysis. Thus *Maxwell* has no application here.

C. *Harris's Petition to Establish the Fact of Marriage Pursuant to Section 103450*

In support of his argument that the parties' failure to obtain a license is a curable defect, Harris relies on the procedures set forth in sections 425, 309 and 103450.

Harris argues that the procedure set forth in section 425 expressly allows for the purchase of a marriage license after a marriage ceremony has taken place. Section 425 provides: "If no record of the solemnization of a marriage previously contracted is known to exist, the parties may purchase a License and Certificate of Declaration of Marriage from the county clerk in the parties' county of residence. The license and certificate shall be returned to the county recorder of the county in which the license was issued." Section 350 provides that "[b]efore . . . declaring a marriage pursuant to Section 425, the parties shall first obtain a marriage license from a county clerk." Sections 350 and 425 provide a mechanism whereby both parties to a solemnized marriage of which there is no known record, may declare the facts necessary to create a record of the marriage. Section 425 requires that both parties join in the declaration and section 350 provides that a license "shall" be obtained before the parties resort to the declaration procedure.

The parties debate whether the marriage that is declared pursuant to section 425 had to have been licensed before it was solemnized. The purpose of the procedure is to create a record of an otherwise unrecorded marriage, thus focusing on the registration requirement, as opposed to the licensing requirement. We need not decide whether section 425 may also be used to cure a defect in the licensing of the marriage, since that issue is not before us. Harris and DePasse made no attempt to declare their marriage pursuant to section 425 before DePasse died. It is undisputed that they never obtained a license, either prior to their marriage ceremony or as part of an attempt to declare their marriage pursuant to section 425. After DePasse died, the section 425 procedure was unavailable to Harris, since both parties must participate in a declaration of marriage.

Harris also relies on section 309 in support of the proposition that the failure to obtain a license is a curable defect. Section 309 provides: "If either party to a marriage denies the marriage, or refuses to join in a declaration of the marriage, the other party may proceed, by action, to have the validity of the marriage determined and declared." Section 309 does not address the licensing issue at all. It simply provides that when there is a dispute regarding the existence of a marriage one of the parties may file suit to determine the validity of the marriage.

Harris also argues that section 103450 provides a mechanism for curing the parties' failure to obtain a license and record their marriage. Section

103450 is found in division 102, chapter 12 of the Health and Safety Code, which is entitled, Court Proceedings to Establish Record of Birth, Death or Marriage. Chapter 12 provides for an ex parte court proceeding "to judicially establish the fact of, and the time and place of a birth, death or marriage that is not registered or for which a certified copy is not obtainable." (§ 103450.) The proceeding is commenced upon the filing of a verified petition which "shall contain all the facts necessary to enable the court to determine the fact of and the time and place of the . . . marriage upon the proofs adduced in behalf of the petitioner at the hearing." (Health & Saf. Code, § 103455.) If the allegations of the petition "are established to the satisfaction of the court, the court may make an order determining that the . . . marriage did in fact occur at the time and place" alleged in the petition. (Health & Saf. Code, § 103475.)

Proceedings to establish a record of marriage differ from actions to establish the validity of marriage (§ 309) in two ways. First, the purpose of the proceeding is to establish a record of the marriage, not its validity. (§ 103450.) Second, the proceeding need not be brought by one of the parties to the marriage. Any "beneficially interested person" may bring it. (*Ibid.*) Either spouse acting alone may bring a proceeding to establish a record of marriage, as Harris did. (Kirkland, *supra*, § 10.64[1], p. 10-77.) The section 103450 procedure may be used when the declaration of marriage procedure is unavailable to a spouse because the other spouse is deceased or otherwise unable to participate in the declaration procedure. (Kirkland, *supra*, § 10.64[1], p. 10-77.)

An ex parte order establishing the fact of marriage pursuant to section 103450 "is merely a statistical record acknowledging the late registration of marriage. It is not presumptive or conclusive proof of the fact of the marriage and has no evidentiary weight whatsoever." (*Schmidt v. Retirement Board, supra*, 37 Cal.App.4th at pp. 1210, 1215-1216 [interpreting former Health & Saf. Code, § 10550, the predecessor statute, which is virtually identical to § 103450].) "[T]he purpose of obtaining the order is to obtain a certificate to replace one which was never registered or to obtain a certified copy of the registration when the original records were lost or destroyed." (*Schmidt*, at p. 1212.) Thus the procedure is designed to cure a failure to register the marriage, not the failure to obtain a license. Harris's reliance on the section 103450 procedure to cure the lack of a license is therefore misplaced.

Harris also argues that the failure to obtain a license is curable because the Family Code does not expressly state that a marriage without a license is void or voidable, citing sections 2200, 2201, and 2210. Section 2200 provides that incestuous marriages are void. Section 2201 provides that bigamous and polygamous marriages are void or voidable, depending on the

circumstances. Section 2210[11] lists other circumstances under which a marriage is voidable and may be adjudged a nullity. Sections 2200, 2201, and 2210 do not state that the grounds listed in those sections are the exclusive grounds for invalidating a marriage. A marriage may be invalid for reasons other than those enumerated in sections 2200, 2201, and 2210. (*In re Marriage of Vryonis* (1988) 202 Cal.App.3d 712, 718-719 [248 Cal.Rptr. 807] (*Vryonis*).)

 Sections 300 and 306 are found in part 1 of division 3 of the Family Code, entitled Validity of Marriage. (Stats. 1992, ch. 162, § 300, p. 474.) Section 300 provides that the parties' consent must be followed by the issuance of a license and solemnization. Section 306 provides that "a marriage shall be licensed, solemnized, and authenticated, and the certificate of registry of marriage shall be returned . . . ." Sections 300 and 306 thus list the five requirements for a valid marriage in California. Section 306 also expressly provides that "[n]oncompliance with this part by a nonparty to the marriage does not invalidate the marriage." For example, a failure by the person solemnizing the marriage to return the certificate of registry would not invalidate the marriage. However, according to the same provision, the parties' failure to comply with one of the requirements for a valid marriage, including the licensing requirement, would invalidate the marriage. Thus sections 300 and 306 provide grounds for determining the validity of a marriage, separate and apart from those stated in sections 2200, 2201, and 2210.

While Harris argues that the parties' failure to obtain a marriage license may be curable, the only effort Harris made to cure the defect was the petition he filed to establish the fact of marriage pursuant to section 103450.

---

[11]Section 2210 provides: "A marriage is voidable and may be adjudged a nullity if any of the following conditions existed at the time of the marriage: (a) The party who commences the proceeding or on whose behalf the proceeding is commenced was without the capability of consenting to the marriage as provided in Section 301 or 302, unless, after attaining the age of consent, the party for any time freely cohabited with the other as husband and wife. [¶] (b) The husband or wife of either party was living and the marriage with that husband or wife was then in force and that husband or wife (1) was absent and not known to the party commencing the proceeding to be living for a period of five successive years immediately preceding the subsequent marriage for which the judgment of nullity is sought or (2) was generally reputed or believed by the party commencing the proceeding to be dead at the time the subsequent marriage was contracted. [¶] (c) Either party was of unsound mind, unless the party of unsound mind, after coming to reason, freely cohabited with the other as husband and wife. [¶] (d) The consent of either party was obtained by fraud, unless the party whose consent was obtained by fraud afterwards, with full knowledge of the facts constituting the fraud, freely cohabited with the other as husband or wife. [¶] (e) The consent of either party was obtained by force, unless the party whose consent was obtained by force afterwards freely cohabited with the other as husband or wife. [¶] (f) Either party was, at the time of marriage, physically incapable of entering into the marriage state, and that incapacity continues, and appears to be incurable."

On the record before us, we conclude that the petition filed by Harris pursuant to section 103450 did not cure the lack of a marriage license.

### D. *Presumption That Ceremonial Marriage Is Valid*

Harris also relies on the presumption in Evidence Code section 663, which provides: "A ceremonial marriage is presumed to be valid." Section 663 codifies a common law presumption recognized in California. (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 663, p. 212, citing *Wilcox v. Wilcox* (1916) 171 Cal. 770 [155 P. 95].) The Evidence Code section 663 presumption is a presumption affecting the burden of proof. (Evid. Code, § 660.) The party attacking the validity of a marriage, the executor in this case, has the burden of proving the marriage is illegal and void. (*Wilcox v. Wilcox, supra,* 171 Cal. at pp. 774-775.) The trial court took note of the presumption of the validity of the marriage, but found that the executor had successfully rebutted that presumption by proving that Harris had never obtained a marriage license. In light of the overwhelming statutory authority that a license is a mandatory requirement for a valid marriage in California and the undisputed fact that the parties failed to obtain a license, we conclude that the trial court was correct when it found that the executor had met his burden of rebutting the presumption of the validity of the marriage.

### E. *Putative Spouse Doctrine*

Where a marriage is invalid due to some legal infirmity, an innocent party may be entitled to relief under the putative spouse doctrine. The doctrine is codified in section 2251, which provides in relevant part: "(a) If a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court shall: [¶] (1) Declare the party or parties to have the status of a putative spouse. [¶] (2) If the division of property is in issue, divide . . . that property acquired during the union which would have been community property or quasi-community property if the union had not been void or voidable. . . ."

Putative spouse status may be based on the reasonable expectations of the parties to an alleged marriage entered into in good faith where the marriage is void or voidable pursuant to section 2200, 2201 or 2210. It also applies where the marriage is invalid for reasons other than those enumerated in sections 2200, 2201, and 2210. (*Vryonis, supra,* 202 Cal.App.3d at pp. 718-719.) However, a subjective good faith belief in a valid marriage by itself, even when held by a credible and sympathetic party, is not sufficient. (*Id.* at p. 720.) A determination of good faith is tested by an objective

standard. (*Ibid.*) Therefore, a proper assertion of putative spouse status must rest on facts that would cause a reasonable person to harbor a good faith belief in the existence of a lawful California marriage. (*Id.* at p. 721; *Centinela Hospital Medical Center v. Superior Court* (1989) 215 Cal.App.3d 971, 975 [263 Cal.Rptr. 672].)

The putative marriage doctrine operates to protect expectations in property acquired through the parties' joint efforts. (*Vryonis, supra,* 202 Cal.App.3d at p. 723, fn. 7.) Subsequent events are not germane to whether there was a proper effort to create a valid marriage, although later conduct can shed light on whether the person had reason to believe he or she was married. (*Id.* at p. 722.)

 The trial court concluded that Harris's assertion of putative spouse status did not rest on facts which would cause a reasonable person to harbor a good faith belief that his marriage was lawful, because he lacked a marriage license, one of the prerequisites for a valid marriage. We find no error in that conclusion. The declarations of both Harris and the chaplain indicate that Harris was aware of the licensing requirement, but elected to go forward without a license because there was "no time." In addition, although the parties lived together for an undisclosed amount of time prior to the marriage, there is no evidence that they ever held themselves out as husband and wife or that they believed they were married before participating in the ceremony at the hospital. DePasse died the day after the ceremony. There was no evidence of any pooling of earnings, acquisition of joint property, or any economic interdependence to support the conclusion that Harris was a putative spouse.

## DISPOSITION

The trial court's order denying Harris's spousal property petition is affirmed.

Mihara, J., and O'Farrell, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied June 26, 2002.

---

*Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.