Filed 9/24/13  Pickens v. Wilson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DESIREE PICKENS, | D062826 |
| Appellant, | |
| v. | (Super. Ct. No. 37-2012-00150915-PR-EB-CTL) |
| DARREN WILSON, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Julia Craig Kelety, Judge.  Affirmed.

Fair Cadora and Lauren M. Fair for Appellant.

No appearance for Respondent.

Desiree Pickens appeals from a judgment denying her petition for a declaration of the invalidity of her marriage to Darren Wilson.  She raises a variety of contentions to support her claim that her marriage should be deemed invalid.  We agree with the trial court's ruling that the marriage was valid, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Pickens and Wilson provided the following factual information to the trial court in support of Pickens's petition to declare the parties' marriage invalid.[1]  In August 1985 Pickens and Wilson obtained a confidential marriage license from the Sacramento County Clerk.  According to Pickens, they were not living together when they obtained the confidential license.[2]  Thereafter, a pastor performed their wedding ceremony at Pickens's church and endorsed the license.  The pastor gave the endorsed license to Pickens and asked her to register it with the county.  Pickens failed to do so.

In 1994, the parties separated.  At the time of their separation, Pickens and Wilson were each told by separate legal counsel that they did not need to obtain a dissolution of the marriage because the marriage was never legally formed given that the paperwork was never filed with the county.  Relying on this advice from counsel, neither party commenced a dissolution proceeding.

In 2009, Pickens married Frederick Pickens (Frederick).  Thereafter, Pickens and Frederick were involved in a dissolution proceeding in Indiana.  In 2012, during the pendency of that proceeding, Pickens filed the instant petition in San Diego superior court, requesting that the court declare her California marriage to Wilson invalid.  Wilson

---

[1]  Wilson did not object to Pickens's petition to declare their marriage invalid. Wilson is not participating in this appeal.

[2]  To obtain a confidential (as opposed to a public) marriage license, the parties are required to be living together.

2

submitted a declaration stating he had no objection to an order finding they never had a legal marriage.

In support of her petition, Pickens argued a legal marriage was never formed because she failed to comply with the mandatory requirement that the marriage license be returned to the county for filing. Pickens acknowledged that there was a statute that preserved the validity of a marriage when a *nonparty* failed to comply with the statutory procedures. However, she contended her case was distinct because it also involved *her own* failure to comply with the statutory registration requirement. Alternatively, Pickens asserted the marriage was void from its inception because she and Wilson had not legally obtained the confidential license given that they had not been living together when they obtained the license.

Pickens also requested an order declaring the marriage invalid on equitable grounds, stating her current husband (Frederick) was "seeking to have her criminally prosecuted in Indiana for bigamy and deprive her of certain rights attaching to a marriage" in the Indiana dissolution proceedings. She cited the facts that she and Wilson had relied on the advice of counsel and believed in good faith the marriage was not valid, and Wilson did not object to an order finding the marriage invalid. She asserted she and Wilson would suffer no negative consequences if the marriage was declared invalid, and

equity supported an invalidation order "to avoid serious prejudice to [her] in Indiana."[3]

After a hearing on April 24, 2012, the trial court denied Pickens's petition. The court found the marriage was valid because a license was obtained; there was consent of the parties; a ceremony took place to solemnize the marriage; and the sole defect of failing to return the license for registration is specifically excused by statute.

## DISCUSSION

Pickens argues the trial court erred in denying her request for an order declaring her marriage to Wilson invalid because the relevant statute only excuses a *nonparty*'s failure to comply with the statutory requirements, and in her case both a nonparty and a *party* failed to return the marriage license to the county for registration. She also raises several additional arguments which we shall delineate below. We first summarize the relevant law.

### Relevant Law

The Family Code specifies the procedures to be followed to create a legally valid

---

[3]    Frederick (Pickens's Illinois husband) filed an objection to Pickens's petition to declare her California marriage invalid, and an attorney appeared at the hearing on Frederick's behalf. At the hearing, Frederick's attorney disputed Pickens's characterization of the Illinois proceedings, stating that Frederick was "not pursuing a prosecution in Indiana." The court questioned whether Frederick had standing to appear in the California proceedings, but concluded this issue did not need to be resolved for purposes of ruling on Pickens's petition to declare her California marriage invalid. Frederick has not attempted to participate in this appeal.

4

marriage in California.[4]  (See *Estate of DePasse* (2002) 97 Cal.App.4th 92, 99

(*DePasse*), overruled on other grounds in *Ceja v. Rudolph & Sletten, Inc*. (2013) 56

Cal.4th 1113, 1126.)  We review the statutes de novo to determine whether Pickens's

marriage to Wilson was legally valid.  (*DePasse, supra*, at p. 99; *Cantarella, supra*, 191

Cal.App.4th at p. 921.)

Section 300 provides that marriage requires (1) consent of the parties, (2) issuance

of a license, and (3) solemnization.  Section 300, subdivision (a) underscores that consent

alone does not suffice; rather, consent "must be followed by the issuance of a license and

solemnization . . . ."[5]

---

[4]      Unspecified statutory references are to the Family Code.
We note that when the parties were married in 1985, the family law provisions governing marriage were set forth in the Civil Code, not the Family Code.  Effective January 1, 1994, the Family Code provisions were enacted to replace these Civil Code provisions.  The portions of the Family Code relevant to this case are substantively essentially the same as the corresponding former Civil Code provisions, with some differences that do not affect resolution of the issues on appeal.  (Cal. Law Revision Com. com., 29C West's Ann. Fam. Code (2004 ed.) foll. §§ 1, p. 2, 300, p. 169; see *In re Marriage of Cantarella* (2011) 191 Cal.App.4th 916, 919, fn. 1, 921-925 (*Cantarella*).)  In the proceedings before the trial court and on appeal, Pickens references the current Family Code, not the former Civil Code.  We do the same.

[5]      Section 300 states:  "(a) Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary.  Consent alone does not constitute marriage.  Consent must be followed by the issuance of a license and solemnization as authorized by this division, except as provided by Section 425 and Part 4 (commencing with Section 500.)  [¶]  (b) For purposes of this part, the document issued by the county clerk is a marriage license until it is registered with the county recorder, at which time the license becomes a marriage certificate."

The Family Code specifies the procedures to secure the license and accomplish the solemnization. Generally, the parties obtain the license from the county clerk; it may be either a public license (§ 350) or, if they have been living together as husband and wife, a confidential license (§§ 500, 501).[6] The parties must present the marriage license to the person solemnizing the marriage. (§§ 359, subd. (c), 421, 506, subd. (a).) The code defines the persons who are authorized to solemnize a marriage (§§ 400-402), and states that solemnization occurs when the parties declare "in the physical presence of the person solemnizing the marriage and necessary witnesses, that they take each other as husband and wife" (§ 420, subd. (a)).

The Family Code also requires the person solemnizing the marriage (the officiate) to (1) authenticate the marriage license, and (2) return the authenticated license to the county so the marriage can be registered. The officiate is required to authenticate the license by ensuring that the required matters are inscribed on the license. (§§ 359, subd. (d), 422, 506, subd. (b); *DePasse, supra*, 97 Cal.App.4th at p. 101.) Thereafter, within a specified time period, the officiate must return the authenticated license either to the

---

[6]     Unlike a public license, a confidential license, although filed with the county, is not available for public inspection. Without a court order, the county clerk may only confirm the existence of the marriage, but may not disclose the date of the marriage or any other information contained on the marriage certificate. (§ 511; Hogoboom & King, Cal. Practice Guide, Family Law (The Rutter Group 2013) § 19.13, p. 19-11.)

county recorder (for a public license), or to the county clerk (for a confidential license). (§§ 359, subd. (e), 423, 506, subd. (c); *DePasse, supra*, at p. 101.)[7]

Section 306 summarizes these procedural steps (license, solemnization, authentication, and registration with the county), and provides that the failure by a *nonparty* to comply with the statutory requirements does *not* invalidate the marriage.[8] (*DePasse, supra*, 97 Cal.App.4th at p. 106.) Further, the code provides for a remedy in the event the license was *not* registered with the county after the solemnization ceremony, allowing the parties to purchase a "License and Certificate of Declaration of Marriage" from the county clerk and return it to the county recorder. (§ 425; see *DePasse, supra*, 97 Cal.App.4th at p. 104.)[9]

---

[7]  Section 423 states:  "The person solemnizing the marriage shall return the marriage license, endorsed as required in Section 422, to the county recorder of the county in which the license was issued within 10 days after the ceremony."
Section 506, subdivision (c) states:  "The confidential marriage license shall be returned by the person solemnizing the marriage to the office of the county clerk in the county in which the license was issued within 10 days after the ceremony."

[8]  Section 306 states:  "Except as provided in Section 307, a marriage shall be licensed, solemnized, and authenticated, and the authenticated marriage license shall be returned to the county recorder of the county where the marriage license was issued, as provided in this part.  Noncompliance with this part by a nonparty to the marriage does not invalidate the marriage."

[9]  Section 425 states:  "If no record of the solemnization of a California marriage previously contracted under this division for the marriage is known to exist, the parties may purchase a License and Certificate of Declaration of Marriage from the county clerk in the parties' county of residence one year or more from the date of the marriage.  The license and certificate shall be returned to the county recorder of the county in which the license was issued."

In *Cantarella, supra*, 191 Cal.App.4th 916, the court concluded a marriage was valid even though the marriage license was not registered with the county due to the *parties'* decision (possibly for tax reasons) not to resubmit the license for registration after it was returned to the parties for a technical error. (*Id*. at pp. 919-920, 924, fn. 8.)[10] The *Cantarella* court reasoned that the core element of a valid marriage is the parties' *consent*. (*Id.* at pp. 923-924.) The *license* and *solemnization* requirements were directed at ensuring that the parties had the capacity to consent and that they were actually consenting; for example, the license disclosed their ages, and at solemnization the parties declared that they accepted each other as spouses. (*Ibid*.; see *DePasse, supra*, 97 Cal.App.4th at pp. 95, 102 [under California's statutory scheme, securement of license essential to valid marriage].) In contrast, the *registration* requirement, which was *the duty of the officiate, not the parties*, did little to ensure the parties had validly consented to the marriage, but rather served a *recordkeeping* function. (*Cantarella, supra*, at p. 924.)

The *Cantarella* court concluded that although the statutory scheme explicitly excused only a *nonparty*'s failure to comply with the statutory requirements, failure to comply with the *registration* requirement did not invalidate the marriage "*regardless of who bore the responsibility for the nonregistration (whether a party or nonparty)*." (*Cantarella, supra,* 191 Cal.App.4th at p. 925, italics added.) *Cantarella* reasoned: "In

_____

10      *Cantarella* evaluated the Civil Code statutes that were the predecessors to the current Family Code statutes. (See *Cantarella, supra*, 191 Cal.App.4th at pp. 919, fn. 1, 921.)

the rare instance where a *party* failed to register public evidence of the marriage, such failure might be inadvertent or involuntary (as in the case of a rejected certificate) or might instead indicate a lack of consent at that time.  We do not believe the Legislature intended a marriage to be thereby rendered invalid.  True, the keeping of accurate and complete marriage records benefits the public.  But this goal pales compared to the societal importance of recognizing the validity of marriages to which the parties have consented.  To hold that a failure by a party to register a certificate voids a marriage would invalidate 'marriages already solemnized in this state and would, among other results, affect the marital status of the parties, their property rights and rights of inheritance.'. . .  [I]t would 'negate the manifold fiduciary and legal obligations the parties understood they were incurring,' due to 'a technical misstep along the way.' "  (*Id*. at pp. 924-925, fns. and citation omitted.)

*Cantarella* further stated that its conclusion was consistent with the statute that permitted a party to purchase substitute documents in the event there was no record of the solemnization of the marriage.  *Cantarella* observed that, significantly, this curative statute did not provide that "in the interim period between the marriage ceremony and the filing of a . . . substitute certificate, the marriage was invalid." (*Cantarella, supra*, 191 Cal.App.4th at p. 925.)

*Analysis*

We agree with *Cantarella*'s reasoning, and, assuming arguendo the nonregistration in this case can properly be attributed to Pickens as well as to her marriage officiate, we apply it here.  It is clear from section 300 that although consent is the core element of a

9

marriage, a valid marriage also requires a license and solemnization. There is no dispute that all three of the elements set forth in section 300 occurred here: the parties intended to consent to the marriage, they obtained a license, and the marriage was properly solemnized by an officiate.

The Family Code also requires authentication of the marriage license by the officiate, and there is no contention this did not occur here. The only missing element was the return of the license to the county for registration, which was the duty of the officiate, not the parties. As recognized by Pickens, under the express terms of section 306, an officiate's failure to perform his or her duties (including the return of the license to the county) does not invalidate the marriage. (*DePasse, supra*, 97 Cal.App.4th at p. 106.)

Likewise, to the extent the failure to register the marriage can be attributed to Pickens's assumption of the officiate's duty, the nonregistration was a technical misstep that did not invalidate the licensed, solemnized, consensual marriage. As explained in *Cantarella*, the technical nature of the registration requirement is shown by the fact that nonregistration does not undermine the core element of consent at the time of the marriage. Further, the statutory provision of a remedy in the event of nonregistration (i.e., the option to purchase a "License and Certificate of Declaration of Marriage" from the county clerk under section 425) reflects that the Legislature perceived nonregistration as a technical error that may be corrected without affecting the validity of the marriage.

To support a contrary conclusion, Pickens cites a footnote in *Cantarella* where the court noted that the current Family Code (unlike the former Civil Code evaluated in

10

*Cantarella*, see fns. 3 & 9, *ante*) contains a provision stating the term "shall" is mandatory, not permissive, and the court posited that the current mandatory nature of the registration requirement "arguably suggests" that under the current code a *party*'s failure to register the marriage license could invalidate the marriage. (*Cantarella, supra*, 191 Cal.App.4th at p. 923 & fn. 7.)[11] The marriage in this case occurred in 1985, which was before enactment of the current Family Code; thus *Cantarella*'s statement concerning the current code is not applicable here. (See fn. 3, *ante*.) In any event, the statement was dicta, and we decline to follow its suggestion. The fact that the statute mandates that the authenticated license be returned to the county for registration does not mean noncompliance with this duty necessarily negates the legal validity of the underlying marriage. (See *Bayside Auto & Truck Sales, Inc. v. Department of Transportation* (1993) 21 Cal.App.4th 561, 566 [not every provision which is mandatory in the sense of being obligatory (rather than permissive) has an invalidating effect in the event of noncompliance].) For the reasons we have explained, we conclude nonregistration of the license with the county does not alone invalidate the marriage, even if a party can be deemed responsible for the nonregistration.

Pickens also argues the marriage was void at its inception because the parties falsely claimed they were living together when they secured the confidential license. We are not persuaded. Although the untrue statement by the parties about their living

---

[11] Section 12 states: " 'Shall' is mandatory and 'may' is permissive. . . ." Sections 306, 423, and 506 state the license "shall" be returned to the county, and section 306 provides that noncompliance by a nonparty to the marriage does not invalidate the marriage. (See fns. 6 & 7, *ante*.)

11

arrangements affected the *type* of license they acquired, it did not alter the facts that they were *entitled* to a license and that *they did in fact secure one*; i.e., this is not a case where the complete absence of a license obviates the validity of the marriage. (Compare *Argonaut Ins. Co. v. Industrial Acc. Com.* (1962) 204 Cal.App.2d 805, 806-807, 809 [parties' placement of assumed names, rather than real names, on marriage license did not invalidate marriage] with *DePasse, supra*, 97 Cal.App.4th at p. 103 [failure to obtain license invalidated marriage; legislative intent to eliminate common law marriage supports that license is essential to valid marriage].) Nor is this a case where the parties obtained a confidential license by misrepresenting their living arrangements under circumstances suggesting the marriage was a sham. (See, e.g., *People v. Hassan* (2008) 168 Cal.App.4th 1306, 1308-1310 [defendant obtained confidential license by falsely claiming parties were living together for suspected immigration fraud purposes].)

Pickens further contends the county did not comply with its duty to notify her that the license must be returned to the county for registration, and her license has expired.[12] Her claim that the county did not notify her of the registration requirement has no bearing on the elements of consent, license, and solemnization, all of which exist here and establish the validity of her marriage. Her contention that her license had *expired* is

---

[12] Both public and confidential licenses expire 90 days after their issuance. (§§ 356, 504.) The county clerk is required to transmit a list of the issued marriage licenses to the county recorder, and if a license has not been returned within 60 days after its issuance, the county recorder must notify the licenseholder that it has not been returned and that it will expire on the date shown on its face. (§ 357, subds. (a), (b).) Also, the county recorder must notify licenseholders that the officiate is obligated to return the license within 10 days after the ceremony. (§ 357, subd. (c).)

12

unavailing since her marriage was solemnized prior to the expiration date of the license. The statutory scheme does not support that the failure to *register* the license causes it to expire; to the contrary, for the reasons we have explained, a license is valid notwithstanding the failure to register it.

Pickens also reiterates her request for equitable relief, noting that Wilson has no objection to an order declaring the marriage invalid, and asserting she will be seriously prejudiced in the Illinois proceeding if the marriage is not deemed invalid. These factors do not undermine the core element of consent to the marriage at the time of its occurrence, and Pickens has not cited any authority to support invalidating a marriage based on these types of considerations.[13]

Finally, Pickens challenges a ruling by the trial court that it had no authority to declare the marriage invalid under Health and Safety Code section 103450 (section 103450). In her petition to the trial court, Pickens cited section 309 and section 103450

---

[13]    The fact that the marriage was valid does not mean Pickens cannot seek to present her claim to the Illinois court that, based on counsel's advice, she had a good faith belief the marriage was invalid and for this reason did not obtain a dissolution before marrying her current husband.

as the statutory basis for her petition to declare the marriage invalid.[14]  The trial court stated it did not believe section 103450 authorized a court to declare a marriage invalid. The court's statement in this regard is of no practical import because after discussing this matter, the court stated that even assuming section 103450 was broad enough to permit the court's adjudication of the validity of the marriage, the court found the marriage to be valid.  Because we agree with the trial court's conclusion on the validity of the marriage, we need not decide the scope of section 103450 in conjunction with section 309.

---

[14]    Section 309 states:  "If either party to a marriage denies the marriage, or refuses to join in a declaration of the marriage, the other party may proceed, by action pursuant to Section 103450 of the Health and Safety Code, to have the validity of the marriage determined and declared."

Section 103450, subdivision (a) states in relevant part:  "A verified petition may be filed by any beneficially interested person with the clerk of the superior court in and for (1) the county in which the . . . marriage is alleged to have occurred, [or] (2) the county of residence of the person whose . . . marriage it is sought to establish . . . for an order to judicially establish the fact of, and the time and place of, a . . . marriage that is not registered or for which a certified copy is not obtainable."

14

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.