[S. F. No. 13078. In Bank.—July 31, 1929.]

ADRIENNE MAYER, Respondent, v. JACK MAYER, Appellant.

Morgan V. Spicer, Goldman, Nye & Spicer and Julius C. Shapiro for Appellant.

George M. Lipman and Harold L. Levin for Respondent.

SEAWELL, J.—Defendant, Jack Mayer, appeals from a decree of the superior court of the city and county of San Francisco annulling his marriage with plaintiff, Adrienne Mayer, on the ground that plaintiff's consent thereto was procured by the fraud of defendant.

The parties were married on June 4, 1926, in the city of San Francisco. Plaintiff was twenty years of age and defendant was twenty-two. Plaintiff resided in the state of New York, with her father and stepmother, and with her stepmother was visiting in San Francisco, having arrived during the first week of May. Said stepmother was then twenty-six years of age. The parties to the marriage met at a dinner given by a distant relative of plaintiff on May 15, 1926, and thereafter saw each other every evening pre-

ceding their marriage. On the evening of June 3d, when they had known each other a little more than two weeks, they agreed to marry on the following day. Defendant was employed as a salesman in a downtown shoe store. The marriage took place during his lunch hour at the city hall, a justice of the peace officiating, and was witnessed by plaintiff's stepmother and a friend of defendant. The defendant left plaintiff a few minutes after the ceremony to return to his employment. On the evening of their wedding day the newly married couple, together with the stepmother and defendant's friend who witnessed the ceremony, had dinner at the States Restaurant upon the invitation of defendant's friend. After dining, the four talked together until 11:30 P. M., according to plaintiff, and until 1:30 A. M., according to defendant, in the lobby of the Stewart Hotel, where plaintiff and her stepmother were staying while in San Francisco. Plaintiff and her stepmother then went to their room in said hotel and defendant and his friend, who were roommates, repaired to the hotel where they resided. On the following day plaintiff and her stepmother left San Francisco for their New York home on a 4 o'clock P. M. train, in accordance with plans made before plaintiff and defendant agreed to marry. It was understood that defendant should follow plaintiff to New York in about six weeks. They did not see each other on the day of plaintiff's departure and did not meet again until the trial of the action herein. Both parties testified that they never lived together as husband and wife.

After an exchange of letters and telegrams, the contents of which will be more fully referred to hereafter, plaintiff, on June 19th, just fifteen days after the marriage, sent defendant a telegram in which she stated that after having had time to think the matter over, she had concluded that she was "too hasty in getting married," and asked of defendant permission to have the marriage annulled. Defendant replied by telegram, "Don't know what it's about. Will not give my consent."

The amended complaint for annulment was filed August 22, 1927. All allegations of fraud therein contained were denied by defendant, who contends upon this appeal from the decree of annulment that the evidence does not support the findings of fraud, and, further, that the fraudulent repre-

sentations found by the court to have been made are not such as the law recognizes as grounds for the annulment of marriage.

The court below decreed an annulment on the basis of findings that defendant falsely and fraudulently represented to plaintiff that he was a merchant and the owner of a shoe store business in the city of San Francisco and of the merchant class, and that he was twenty-eight years of age and had seen service in France while in the army, when in fact he did not own a shoe store, but was merely a shoe salesman employed on a salary basis, and was only twenty-two years of age and had not seen service in France during the World War.

In her complaint plaintiff alleged as a further ground of fraud that "at the time of said marriage defendant had no intention of consummating said marriage." The court did not squarely find on this allegation, but it did find that defendant represented to plaintiff that he would enter into the marriage relation with her, and plaintiff believed, trusted and relied upon such representations and was thereby induced to consent to said marriage, and that defendant had not asked plaintiff to live with him as man and wife and at no time had they lived together or cohabited as man and wife.

This court held in *Millar* v. *Millar*, 175 Cal. 797 [Ann. Cas. 1918E, 184, L. R. A. 1918B, 415, 167 Pac. 394], in line with the weight of authority, that if one of the parties to a marriage goes through the ceremony with an intention not to consummate the marriage by marital intercourse, and persists in such intention, an annulment will be granted upon the application of the other party on the ground of fraud. (*Anders* v. *Anders*, 224 Mass. 438 [L. R. A. 1916E, 1273, 113 N. E. 203].) But the findings of the court in the instant case do not either expressly or by clear implication state that defendant went through the marriage ceremony with the intention never to consummate the relationship, and, in view of the facts and circumstances of the case, we are of the view that the evidence, as a matter of law, impels a finding that defendant did not go through the ceremony with such a fraudulent intention.

In support of the contention that said defendant married plaintiff with the design in some way to profit financially

from the wealth of her father without consummating the marriage, counsel for plaintiff rely upon his conduct, as testified to by plaintiff, on the day of the marriage and on the following day, when plaintiff left for the east. Plaintiff testified that defendant did not ask her to go with him on the night of June 4th, or to postpone her return to New York. Defendant testified that he asked plaintiff to come with him on said night and to remain in California, but that plaintiff said she disliked San Francisco and she and her stepmother urged the lateness of the hour and the fact that they had much packing to do as reasons why plaintiff should not go with him on the night of June 4th. The court below found against defendant on this point. Defendant further stated that he called the hotel on the telephone the next day and was informed that plaintiff was not in, whereupon he sent her a corsage of gardenias; that he asked at his place of employment to have the afternoon off, but as the day was Saturday and the store short-handed, permission was refused him. Plaintiff denied having received the gardenias and asserted that she and her stepmother were in the hotel throughout the day. Defendant further stated that upon calling for plaintiff on June 3d, the night before their marriage, plaintiff herself brought up the subject of matrimony by asking him if he still felt about their getting married as he had on the previous night and he replied that he did. According to plaintiff, defendant first asked her to marry him on the third night they were together, and thereafter proposed to her every night until she accepted him on June 3d. Defendant admitted having proposed to plaintiff several times. Plaintiff testified that defendant gave as his reason for not going to New York with her his inability to immediately terminate his employment.

After plaintiff reached her home in New York on June 11th she and defendant exchanged telegrams and letters, which will be briefly noticed here for the insight which they afford into the defendant's intentions in marrying plaintiff and her reasons for desiring an annulment of her marriage to him. The attitude of the parties toward each other, as indicated in said messages, furnishes an irrefutable answer to any claim that defendant married plaintiff with a preconceived intention not to consummate the marriage.

On the day of her arrival home plaintiff sent two telegrams to defendant. In one she said: "Arrived cannot understand why you don't write love Adrienne." In the other she asked defendant to send "loads of letters and pictures" and said that it seemed an eternity since they had parted. Plaintiff's father also sent a telegram of congratulations to defendant on June 11th, and a second telegram on June 14th asking him when he could come to New York. Defendant testified to having called plaintiff on the telephone from San Francisco on the night of June 11th. Plaintiff denies such a telephone call. A letter written by defendant on June 11th appears in the record. Defendant testified to writing a letter to plaintiff prior to June 11th, but such a letter does not appear in the record. The letter of June 11th was written in an endearing tone. Defendant addressed plaintiff as "Dearest of all," signed himself "Yours for life," and expressed appreciation of her father's congratulations. In a letter written on June 17th defendant expressed concern over plaintiff's not having written to him, and said he did not think it would be over six weeks before he would be on his way to plaintiff and then they would "be parted never again." And on June 19th he telegraphed to plaintiff: "No mail since you left. Worried. Wire day letter tonight."

. On June 17th plaintiff wrote her first letter to her husband since their marriage on June 4th and posted it for air mail delivery on June 18th. In it she says: "But getting down to brass tacks, old timer, when are you going to let us breathe a sigh of relief and hang up our 'Welcome Home' sign to the 'Prodigal Son'? . . . It is always hard for me to become serious, Jack, dear, haven't said one word that would make you know how lonesome or in love with you I am, but you do read between the lines don't you, old sweetheart, for that's what I've been meaning right along."

On June 19th, just two weeks after their marriage, she sent defendant a telegram in which she said: "After having had time to think matter over have concluded that I was too hasty in getting married. Will you send me your permission to have it annulled. Wire at once." In response to a telegram from defendant in which she said that he did not know what it was about and would not give his consent, plaintiff sent another telegram and, on June 23d, wrote

a letter to her husband in which she said: "Jack, dear, please don't be a big bear; just say 'Adrienne go out and get all the annulments your little heart desires, and be happy,' while to yourself you can say, 'Well, Jack, my boy, consider yourself well rid of a typical New York flapper—fickle, irresponsible, and untamed.'

"It's all true, Jack. After turning matters over in my mind, I've decided that I can't really settle down seriously and give up all the pretty things and luxuries and theatre parties and wanderings that I have indulged in so promiscuously. With Daddy, it was always merely to express a desire to go here, to wish to buy this, a desire to do that, with never a thought to money or anything. It is next to impossible for me to become serious or settled down. . . . No, Jack, I can't give up my freedom, my own way, and pretty clothes for anybody." On June 25th, after she had expressed her desire to obtain an annulment, plaintiff sent defendant a small gift, inclosing a card as follows: "June 25th, To husband Jack. Here's a smoke with Addie's love."

Defendant's reply expressed a lack of ability to understand plaintiff's attitude, and suggested that she come to California, as he would never consent to an annulment in New York. In a telegram of June 28th plaintiff's father requested defendant to come to New York, offering to pay his expenses, if necessary, and on June 29th defendant replied that it would be impossible for him to leave San Francisco. On August 7th plaintiff's father wrote a letter to defendant in which he gave as his daughter's reasons for desiring an annulment the same reasons she had given defendant in her letter of June 23d. On November 9th defendant sent plaintiff birthday congratulations, and on December 16th he wrote asking her if she would approve of his coming to New York. He also testified that he sent her a remembrance for Christmas, which was returned to him unopened. Defendant gave no reason upon the trial for not going to New York other than that he thought it was the place of plaintiff and her father to come to him, rather than for him to go to them, in view of the attitude of plaintiff, and that he was short of funds and did not wish to go at his father-in-law's expense. He left San Francisco February 22, 1927, for Kansas City, Missouri, where his father resided, and did not return until shortly before the trial.

It appears that prior to the trial of the action herein defendant had filed suit in New York against plaintiff's father to recover one hundred thousand dollars as damages for alienation of plaintiff's affections. Plaintiff testified that defendant's attorney had made an offer to her and her father on behalf of defendant to withdraw opposition to an annulment suit upon payment of a sum of money. Defendant denied having authorized his attorney to make any such offer.

In urging a purpose on the part of defendant to realize a financial advantage from his marriage with plaintiff without consummating said marriage, plaintiff does not suggest the precise manner in which defendant intended to thus profit. That he married her with the preconceived intention of making it appear that her father had deprived him of her love and affection and thereafter recovering monetary damages in an alienation of affections suit against said father, or with the idea of so conducting himself that plaintiff would desire to file a suit for annulment, to which he would agree to make no opposition only upon payment of a sum of money, is to attribute a degree of knavery to defendant which does not find support in the record. The letters and telegrams noticed above possess a ring of sincerity. The messages of both are such as are written by young people who are, or imagine themselves to be, much in love. We cannot regard defendant's expressions of love for his bride as simulated and part of a cleverly conceived scheme to mulct her father of money. Said messages reveal a regard and affection for plaintiff utterly inconsistent with a marriage entered into by defendant with a design never to live with plaintiff as husband and wife.

Said communciations are also important in consideration of plaintiff's claim to have the marriage annulled on account of the alleged fraudulent representations made by defendant as to his financial standing.

Although plaintiff claims to have sent the telegram of June 19th, in which she stated her purpose to obtain annulment, because she learned that defendant had falsely represented his financial position and ability to support her, she sent said telegram before she could possibly have learned of the alleged fraud practiced upon her through the only channel from which she claims to have acquired the information. She

testified that after she wrote to defendant on June 17th she wrote to the distant relative in San Francisco at whose home she had met defendant, and that it was in a reply letter written by said relative that she first learned of defendant's deception. A reply to a letter written in New York on June 17th, or shortly thereafter, and addressed to San Francisco, could not have been received by mail on or before June 19th, at the time plaintiff sent her telegram, and it is quite unlikely that a reply would have been received on June 23d, the day on which plaintiff wrote to defendant, making plain her desire to obtain an annulment for the insufficient reasons stated by her. At least plaintiff made no reference thereto in the letter of June 23d, nor did her father in the letter he subsequently wrote in regard to the matter of annulment, charge defendant with practicing a fraud upon his daughter. Plaintiff did not produce the letter written by said relative upon the trial. One of the attorneys for defendant, in an affidavit presented upon motion for a new trial, offered to prove by the testimony of said relative to whom plaintiff claims to have written, that said relative had neither received a letter of inquiry from nor had she written to plaintiff concerning defendant. Plaintiff's explanation that although she desired an annulment because of defendant's fraud she withheld from him the true reason through a desire to be "polite" to him, appears inherently improbable. Likewise lacking in credibility is her explanation that her father failed to charge defendant with fraud in the letter he wrote in attempting to obtain defendant's agreement not to oppose an annulment because plaintiff had not informed her father of said fraud for the reason that she did not wish him to know the truth. We are, therefore, of the view that the record, as a matter of law, will sustain no other conclusion than that plaintiff desired an annulment for the reasons stated by her and her father in their letters to defendant, which had nothing to do with any fraudulent representations made by defendant to her.

Plaintiff testified that defendant represented to her that he owned a shoe store, was manager of the store in which he was then employed, and was able to support her in the manner in which she was accustomed to live, and that he told her he was twenty-seven years of age and had seen

service in the World War in France. In fact, he was only twenty-two, which was the age he gave in his application for a marriage license, and was employed as a clerk and assistant manager in a shoe store, earning between forty-five and fifty dollars a week, and although he had been in the army in 1919–1920, he had never seen service in France: ▮ In her complaint plaintiff makes no reference to fraudulent representations as to age and service in the World War as grounds for annulment. It is the general rule that fraudulent representations to be relied on must be pleaded. Defendant denied making the representations set forth in the complaint.

Plaintiff does not claim that defendant represented himself as owning the shoe store in San Francisco in which he was in fact an employee at the time of his marriage. In one instance she stated that he told her he *had* owned a shoe store, the implication following that he did not then own such a store. Plaintiff did not state that any representations as to the location, size or other facts concerning said store were made, or explanation offered as to why, if he was the owner of a shoe store, he was not engaged in managing it, rather than in working on a salary basis for another. The alleged representation that he was able to support her in the manner in which she was accustomed to live is very indefinite. Defendant denied absolutely making the representations charged against him, but the court below found in plaintiff's favor on this issue. The indefinite character of the representations alleged to have been made, as well as the circumstance that neither plaintiff nor her father in their negotiations with defendant in regard to the annulment make any reference thereto, tends to strongly corroborate defendant's denial. The business and social standing of defendant could have been easily determined by plaintiff had she made the slightest investigation. Undue haste can only account for a failure to make reasonable inquiry. Plaintiff's statements in her letter of June 23d, probably written before she had received the information as to defendant's alleged misrepresentations, that she could not give up all the luxuries she had indulged in, nor her freedom, her own way and pretty clothes for anybody, and that with her father she had merely to express a desire, with never a thought for money, furnish strong and convincing

evidence that she was aware that defendant did not possess the means to support her in the manner in which she claims to have been living.

But even though said representations were in fact made, they fall short of constituting fraud sufficient to annul a marriage. By reason of the interest of the state and society in the preservation and integrity of the marriage relation, it has been declared that fraud which would afford grounds for rescinding an ordinary contract will not justify an annulment of marriage, and that the fraud necessary to avoid a marriage must be such as is deemed vital to the marriage relationship. (*Barnes* v. *Barnes,* 110 Cal. 418 [42 Pac. 904]; *Wilcox* v. *Wilcox,* 171 Cal. 770 [155 Pac. 95]; *Franke* v. *Franke,* 3 Cal. Unrep. 656 [18 L. R. A. 375, 31 Pac. 571].) In the application of this rule it has been held that misrepresentations as to social and financial position are insufficient. More recent cases show a proper tendency to depart from the rigidity of the early decisions. The more modern trend is indicated by such cases as *Brown* v. *Scott,* 140 Md. 258 [22 A. L. R. 810, 117 Atl. 114], where it was held that grossly false representations of an ex-convict and fugitive from justice as to his moral, social and financial standing constituted ground for annulment at the suit of the young girl whom he had duped into marriage with him. Moral turpitude which seriously affects the character of the impostor would, of course, furnish sufficient grounds for annulment.

The circumstances of the instant case fall far short of presenting the aggravated situation of *Brown* v. *Scott.* No charge is made against defendant's morals other than that he made the false representations testified to by plaintiff. He testified that it was his custom to work for a time as a clerk in a shoe store and then to join a ship's orchestra, receiving his passage and board for his services playing the violin. No wide discrepancy appears in the standards of living of the parties. They were married in haste and with little thought of the responsibilities they were assuming.

Since we have held that upon the merits plaintiff is not entitled to an annulment, it is unnecessary to determine the claim of defendant that the court below was without jurisdiction of the action, although the marriage was solemnized in California, for the reason that neither plaintiff nor defend-

ant was domiciled in or a resident of California at the time suit was commenced. It is the contention of defendant that in annulment proceedings, as in divorce actions, jurisdiction is dependent upon domicile at the time of commencement of the action. There are essential differences between the two proceedings in nature and effect. Since the validity of marriages is generally determined by the law of the state where the marriage took place, there are cogent reasons why annulment should be sought in the tribunals of that state. In *Millar* v. *Millar, supra,* this court did not decide the precise point argued by defendant, but did hold that section 128 of the Civil Code, requiring a year's residence in the state and a three months' residence in the county, in divorce actions, was not applicable to annulment proceedings. (See, also, *McCormack* v. *McCormack,* 175 Cal. 292 [165 Pac. 930].) The citations of opposing counsel in the instant case indicate a divergence of authority on the question here raised. Since it is not essential to the decision of the instant case to decide this issue, and the question is one requiring a more thorough and painstaking research than we feel we would be justified in giving to it at this time, we pursue it no further.

The evidence shows that the parties to this action voluntarily entered into the marriage state unadvisedly and lightly. Under such circumstances the law should not be required to give aid in disentangling a situation to the existence of which there is no legal objection. That a marriage should not be annulled upon the ground of fraud except in an extreme case, where the particular fraud goes to the very essence of the marriage relation, see 16 Cal. Jur. 937; *Millar* v. *Millar, supra; Richardson* v. *Richardson,* 246 Mass. 353 [31 A. L. R. 146, 140 N. E. 73]; *Wells* v. *Talham,* 180 Wis. 654 [33 A. L. R. 827, 194 N. W. 366]; *Robertson* v. *Roth,* 163 Minn. 501 [39 A. L. R. 1342, 204 N. W. 329]; *Bannon* v. *Bannon,* 50 Wash. L. Rep. 22 [23 A. L. R. 178].

Judgment reversed.

Curtis, J., Langdon, J., Shenk, J., Waste, C. J., and Richards, J., concurred.