[No. A106079. First Dist., Div. Two. July 18, 2005.]

In re the Marriage of ANN MARIE MEAGHER and MALEKPOUR MALEKI.
ANN MARIE MEAGHER, Respondent, v.
MALEKPOUR MALEKI, Appellant.

**COUNSEL**

Lareybi & Associates and Shahbaz Rahbari for Appellant.

Edward Napier Thomson and Byron Benjamin Kilgore for Respondent.

**OPINION**

**RUVOLO, J.**—The law in California has long been that an annulment of marriage may be granted on the basis of fraud only "in an extreme case where the particular fraud goes to the very essence of the marriage relation." (*Marshall v. Marshall* (1931) 212 Cal. 736, 739–740 [300 P. 816]; accord, *Barnes v. Barnes* (1895) 110 Cal. 418, 421–422 [42 P. 904].) Based on that settled rule, in this case we reverse a judgment granting an annulment to a wife whose husband, prior to the marriage, misrepresented his financial status and fraudulently induced her to invest in a business venture with him, with the intent to gain control of her assets.

## FACTS AND PROCEDURAL BACKGROUND

Appellant Ann Marie Meagher is a physician licensed as a psychiatrist. Respondent Malekpour Maleki is a real estate broker and investor, and has also been an importer and wholesaler of jewelry and Persian rugs.[1] Meagher and Maleki first met socially in October 1997. At the time, Meagher was partially disabled and nearing retirement age, but was still working part time for the City and County of San Francisco. Maleki was in his late sixties and was living on the income from some real property he owned. Meagher believed Maleki to be a well-educated millionaire with expertise in real estate and finance.

Meagher and Maleki developed a romantic relationship, and became engaged in February 1998. They also entered into a business relationship, in the course of which Meagher bought three residential properties as an investment. Meagher bought the first property (in San Francisco) through Maleki as broker, and the other two (in Daly City and Concord) directly from him. With respect to the properties that Meagher bought directly from Maleki, he promised her that when they were sold, he would reimburse her for their purchase price. Meagher thought that he had done so, but realized later that the reimbursement had not been complete.

---

[1] The trial court expressly found Maleki's trial testimony not to be credible, and declined to give it "any weight whatsoever." Maleki has not challenged this credibility determination on appeal, nor has he contended that the trial court's findings are not supported by substantial evidence. Accordingly, consistent with the applicable standard of review, we adopt the facts as expressly or impliedly found by the trial court, and construe that court's findings in Meagher's favor. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642 [11 Cal.Rptr.3d 807]; see also *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813]; *SFPP v. Burlington Northern & Santa Fe Railway Co.* (2004) 121 Cal.App.4th 452, 461–462 [17 Cal.Rptr.3d 96].)

On December 7, 1998, after Meagher had purchased the three parcels of real property, Meagher and Maleki entered into a handwritten agreement providing that the properties "are legally in the name of Ann-Marie Meagher, which as of 11/1/98, with the agreement of both parties, are owned 50/50, and every cost is shared 50/50 between the parties."[2] As Meagher understood it at the time, as of November 1, 1998, she gave Maleki a half-interest in the property she had bought in San Francisco, and Maleki had by then already paid her for a half-interest in the Daly City and Concord properties.

On May 18, 1999, Meagher and Maleki entered into a second handwritten agreement (the May 1999 agreement), which provided that it was being entered into "for purposes of a real-estate investment mostly in [a] commercial shopping center." The May 1999 agreement provided that Maleki and Meagher "shall be as partner[s] all in term[s] of fifty/fifty share of entire real-estate business investment and capital investment as equal share holder[s]" and that they "each are liable for all profit and loss of operating business according to their fifty percent equal share regardless [of] who carr[ies] the title and owns the properties." Although the parties were to be equal owners of the business venture, the May 1999 agreement provided that Maleki was "solely responsible for operating the business and run[ning] the real-estate business for profit and expand[ing] the real-estate asset[s] at his will." As contemplated by the May 1999 agreement, the proceeds from the sale of the San Francisco and Concord properties, plus some additional funds, were used to purchase a shopping center in San Leandro. Title to all of the real estate was held in Meagher's name.

On August 28, 1999, after entering into the agreements for the business venture, Meagher and Maleki married. At the time of the marriage, the parties were already living together in Meagher's home in Tiburon. Meagher had between $1 million and $1.5 million in assets in addition to the substantial equity in her expensive home. For some time after the marriage, Meagher

---

[2] During the various hearings in the case, the trial court sometimes characterized the parties' business arrangement as a partnership. The judgment, however, refers to it only as a joint venture. Maleki describes it both ways in his briefs on appeal, but does not expressly address the issue. The distinction may or may not matter in the long run, but it certainly is not relevant to the issues before us on this appeal. Inasmuch as the issue has not been briefed by either party, it would be inappropriate for us to appear to be resolving it one way or the other in this opinion. We will therefore use the generic term "business venture" to refer to the parties' real estate investment arrangement.

continued to work part time, and Maleki managed the parties' business venture. During this period, Meagher drew money out of her retirement savings in order to fund additional real estate investments made by the business venture.

Meagher continued to believe that Maleki was wealthy until sometime in February 2002, when Maleki told Meagher that the couple did not have enough money to cover either their living expenses or their business expenses, which included a large tax bill. At that point, Meagher began to doubt what Maleki had been telling her about his financial situation and about how he was running their business venture. She revoked a power of attorney she had given him, and demanded more information about the business venture.[3] At that point, Maleki became hostile and began talking about getting a divorce. Meagher still wanted to make the marriage work, however, because she did not want a divorce for religious reasons.

In mid-April 2002, however, Maleki told Meagher that he would divorce her if she did not put all her assets, including her home and pension, into joint tenancy and give him total control. At that point, Meagher began to suspect that Maleki had married her just for her money. She asked Maleki to buy out her share of the business venture, as he had always represented to her he had the means to do, but he told her that he could not and did not want to do so.

The parties separated in April or May 2002, and on May 6, 2002, Meagher filed a petition for dissolution of the marriage. She requested that various items of real property be confirmed as her separate property. Maleki's response asserted that "[a]ll property is community property or commingled joint, separate and community property," and contended that "[a]ll of [Meagher's] separate property claims should be denied."

On November 4, 2002, Meagher filed a motion seeking a summary adjudication annulling her marriage and an order directing restitution to her of property she asserted had been taken from her by Maleki. Maleki consented to the amendment of Meagher's petition, but the trial court denied summary judgment on the ground that Meagher's state of mind at the time of the marriage was an issue of fact.

---

[3] Even before the parties' marriage, Maleki had responded only reluctantly and *incompletely* to Meagher's requests for information about their business venture.

On January 21, 2004, after protracted pretrial and trial proceedings, the trial court entered a judgment of nullity on the ground of fraud. (Fam. Code, § 2210, subd. (d).) The court found that Meagher reasonably believed Maleki's representations to her that he was contributing equally to the parties' business venture, that Maleki misled her, and that other than Maleki's initial contribution of approximately $100,000 to $125,000, "[e]verything of material value that went into the venture was hers." The court determined that not only the business venture but also the parties' "marriage was based . . . on [Meagher's] reliance upon [Maleki's] representation that he had great wealth [and] that [he] would take care of her[,] and not that he expected through a series of transactions to divest her of at least half an interest in several million dollars' worth of property."

Based on these findings, the court concluded that "there was never a marriage" and that a judgment of nullity should be entered, and therefore that all the assets at issue were Meagher's sole and separate property. It also awarded Meagher her costs and attorney fees, and ordered Maleki to repay the temporary spousal support and interim attorney fees that he had received earlier in the proceedings. Maleki timely appealed from the judgment.

## DISCUSSION

On this appeal, Maleki does not challenge the trial court's factual findings that he fraudulently misrepresented his financial circumstances to Meagher prior to the marriage, and that he deceived her in connection with the business venture. He argues, however, that, as a matter of law, a prospective spouse's fraud regarding financial matters is not a proper basis upon which to order an annulment.

■ The long-standing general rule in California is that "a marriage may only be annulled for fraud if the fraud relates to a matter which the state deems vital to the marriage relationship. [Citations.]" (*Bruce v. Bruce* (1945) 71 Cal.App.2d 641, 643 [163 P.2d 95].) As one court explained, "because of its peculiar position as a silent but active party in annulment proceedings[,] the state is particularly interested in seeing that no marriage is declared void as the result of fraud unless the evidence in support thereof is both clear and convincing. Thus[,] . . . [because] '[t]he state has a rightful and legitimate concern with the marital status of the parties[,] . . . the fraud relied upon to secure a termination of the existing status must be such fraud as directly affects the marriage relationship and *not merely such fraud as would be*

*sufficient to rescind an ordinary civil contract.*' [Citations.]" (*Williams v. Williams* (1960) 178 Cal.App.2d 522, 525 [3 Cal.Rptr. 59], italics added [affirming denial of annulment based on trial court's factual findings either that wife did not misrepresent that she was widowed rather than divorced, or that husband did not rely on her representation in deciding to marry her].)

The most recent published opinion upholding an annulment on the basis of fraud dates from 1987, and involves the paradigm example of a spouse who "harbors a secret intention at the time of the marriage not to engage in sexual relations with [the other spouse]. [Citations.]" (*In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 156 [242 Cal.Rptr. 649]; accord, e.g., *Handley v. Handley* (1960) 179 Cal.App.2d 742, 746 [3 Cal.Rptr. 910]; *Millar v. Millar* (1917) 175 Cal. 797 [167 P. 394].) Similarly, "the secret intention of a woman concealed from her husband at the time of marriage never to live with him in any home provided by him would be a fraud going to the very essence of the marriage relation and of such a vital character as to constitute [a] ground for annulment." (*Bruce v. Bruce, supra,* 71 Cal.App.2d at p. 643.) Annulment has also been held justified based on a wife's concealment that at the time of marriage she was pregnant by a man other than her husband (*Hardesty v. Hardesty* (1924) 193 Cal. 330 [223 P. 951]; *Baker v. Baker* (1859) 13 Cal. 87), or on a party's concealment of his or her sterility (*Vileta v. Vileta* (1942) 53 Cal.App.2d 794 [128 P.2d 376]) or intent to continue in an intimate relationship with a third person (*Schaub v. Schaub* (1945) 71 Cal.App.2d 467 [162 P.2d 966]).

■ As these cases illustrate, annulments on the basis of fraud are generally granted only in cases where the fraud related in some way to the sexual or procreative aspects of marriage. The only California case of which we are aware that granted an annulment on a factual basis not directly involving sex or procreation is *Douglass v. Douglass* (1957) 148 Cal.App.2d 867 [307 P.2d 674] (*Douglass*). In *Douglass*, the Court of Appeal reversed a judgment denying an annulment to a woman whose husband, prior to their marriage, had "falsely and fraudulently represented to her that he was an honest, law abiding, respectable and honorable man" (*id.* at p. 868), and that he had only one child from a prior marriage, who was " 'well provided for.' " (*Ibid.*) In fact, the husband had been convicted of grand theft only a few years earlier and was still on parole, and three months after the marriage he was arrested for parole violation due to his failure to support his two children from his prior marriage.

■ The *Douglass* court acknowledged that the test for annulment based on fraud is "whether the false representations or concealment were such as to defeat the essential purpose of the injured spouse inherent in the contracting of a marriage." (*Douglass, supra,* 148 Cal.App.2d at pp. 868–869.) The opinion in *Douglass* went on to state in rather general terms that because "the fraud of [the husband] in concealing his criminal record and true character was a deceit so gross and cruel as to prove him to [the wife] to be a man unworthy of trust," refusing her request for an annulment would be "unjust and intolerable." (*Id. at p. 870.) The facts of Douglass* make clear, however, that the court did not grant an annulment based merely on the husband's general untrustworthiness. In holding the wife entitled to an annulment, the court relied in part on the fact that she already had two children from a former marriage, and that because of this, the "essentials of the marital relationship," from the wife's perspective, necessarily included having "a husband of honorable character whom she could respect and trust, . . . and who would be a suitable stepfather for her children." (*Id.* at pp. 869–870.) When the wife learned the truth about the husband's failure to provide for his own children, her "hopes were shattered and her purposes defeated." (*Id.* at p. 870.) Thus, even in *Douglass*, the fraud that the court found to be sufficient grounds for annulment had some nexus with the child-rearing aspect of marriage.

■ In the absence of fraud involving the party's intentions or abilities with respect to the sexual or procreative aspect of marriage, the long-standing rule is that neither party "may question the validity of the marriage upon the ground of reliance upon the express or implied representations of the other with respect to such matters as character, habits, chastity, *business or social standing, financial worth or prospects*, or matters of similar nature." (*Schaub v. Schaub, supra,* 71 Cal.App.2d at p. 476, italics added.) In *Marshall v. Marshall, supra,* 212 Cal. 736, 740, for example, the court expressly held that the trial court properly denied relief to a wife who sought an annulment on the basis of her husband's "fraudulent representation as to his wealth and ability to support and maintain" her, when in fact he was "impecunious" and subject to "harassment by creditors." (*Id.* at pp. 737–738; accord, *Mayer v. Mayer* (1929) 207 Cal. 685, 694–695 [279 P. 783] [shoe salesman's misrepresentation that he owned shoe store not sufficient grounds for annulment].)

More recent case law has not changed this long-standing rule. In 1993, for example, the Fourth District reversed a judgment granting an annulment to a wife who discovered after the marriage that her husband had concealed the facts that he had a severe drinking problem for which he declined to seek

help, and that he did not intend to work for a living. Even though the wife also alleged that the couple's "sex life after marriage was unsatisfactory," the court still found that the fraud did not "go to the *very essence* of the marital relation" and therefore was not sufficient as a basis for an annulment. (*In re Marriage of Johnston* (1993) 18 Cal.App.4th 499, 500–502 [22 Cal.Rptr.2d 253], original italics.)

In the present case, Meagher does not contend that there is any evidence that Maleki lied to her about his marital history, or that he concealed an intention not to have sexual relations with her, not to live with her after the marriage, or not to discontinue an intimate relationship with a third party. On the contrary, the parties began living together even before their marriage and continued to do so for well over two years thereafter, and Meagher cites to no evidence in the record that she ever expressed any dissatisfaction with the intimate aspects of their relationship. Instead, she argues that the financial fraud at issue in this case is "at least as contrary to the essence of marriage" as the types of fraud that have been held sufficient to justify annulment. She cites no authority, however, either in California or elsewhere, for the proposition that annulment can be granted based on fraud or misrepresentation of a purely financial nature. As already noted, the cases are entirely to the contrary. Accordingly, we agree with Maleki that the fraud established in this case, as a matter of law, was not of the type that constitutes an adequate basis for granting an annulment.

Because we reverse the trial court's decision on this basis, we need not and do not address Maleki's alternative arguments that Meagher failed to establish the elements of her fraud claim. We leave it to possible future trial court proceedings to determine whether Meagher is entitled to rescission of the agreements underlying the business venture on the ground of fraud, and if so, what remedies are appropriate (see generally, e.g., *Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 316 [85 Cal.Rptr. 138, 466 P.2d 682] [purpose of rescission is to restore both parties to their former position as far as possible and to bring about substantial justice by adjusting equities between parties]), including what effect rescission may have on the characterization of the assets of the business venture as separate or community property for dissolution purposes.[4]

---

[4] Although he appealed from the judgment granting an annulment, Maleki does not oppose the issuance of a judgment of dissolution.

## DISPOSITION

The judgment is reversed, and the case is remanded to the trial court for further proceedings. In the interests of justice, the parties shall each bear their own costs on appeal.

Haerle, Acting P. J., and Lambden, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 28, 2005.