165 Cal.App.4th 751 (2008)
In re the Marriage of JORGE L. RAMIREZ and LILIA LLAMAS.
JORGE L. RAMIREZ, Appellant,
v.
LILIA LLAMAS, Respondent.
No. E043180.
Court of Appeals of California, Fourth District, Division Two.
July 30, 2008.
*753 Darrell J. York for Appellant.
Ellen Weinfurtner for Respondent.

OPINION
RAMIREZ, P. J.
Jorge L. Ramirez (Jorge)[1] appeals from a judgment annulling his second marriage to Lilia Llamas (Lilia), following a bifurcated trial in which the court found the marriage void due to fraud. The trial court found the first marriage between Jorge and Lilia was a void attempt at a Mexican marriage performed in California. It found the second marriage void because of fraud, relating to the fact Jorge married Lilia even though prior to the second marriage he had begun a love affair with Lilia's sister that he intended to continue. Jorge appeals the judgment of nullity, and the finding that Lilia was a putative spouse. We affirm.

*754 BACKGROUND
Jorge, an immigrant from the State of Michoacán, Mexico, lived in the United States and sought legal residence here. His mother was a permanent resident and sponsored Jorge in his application for that status. He began his application process in 1994 or 1995 but because his mother was not a citizen herself, the process took many years.
In 1999, Jorge and Lilia were married in a religious ceremony in Moreno Valley, California. The ceremony was performed by a priest or other official from the State of Jalisco, Mexico, and an "Acta de Matrimonio" was issued. No marriage license was issued by the State of California. In 2001, Jorge and Lilia became aware that the 1999 marriage was invalid because Lilia's prior divorce had not been final for 300 days prior to the marriage. Additionally, because it was made to look as though the parties were married in Mexico, the Mexican marriage certificate would prevent Jorge from getting his green card because it would make it appear that he had not been in continuous residence in the United States.
The parties were remarried in 2001 and obtained a confidential marriage license. After the death of Jorge's mother, Lilia assumed the position as Jorge's sponsor to pursue his application for permanent residence and citizenship. In 2004, after she signed a document related to his immigration status, Jorge informed Lilia that it would be the last one. Two weeks later, in May 2004, he took Lilia out to dinner and asked for a divorce because he was in love with someone else and always had been. In June 2004, Jorge moved out.
That same month, Lilia found out who the other woman was when she overheard a conversation between Jorge and Lilia's sister Blanca. Jorge had begun an affair with Blanca prior to the 2001 marriage, and it lasted until 2005. The intercepted conversation occurred in 2005. Lilia asked her teenaged son Victor to call Blanca, who babysat for Jorge and Lilia's daughter, on her cell phone to inquire if she would be joining them for lunch with the child. Blanca, at a restaurant with Jorge, had the cell phone in her purse. Instead of pressing the stop key, she pressed the button to answer the call, so the conversation she was having with Jorge was overheard on Victor's cell phone, which Lilia and Victor listened to by activating the loudspeaker. In this conversation, Jorge professed his love for Blanca, assured her that they would be together once he got his share of money and property from Lilia, *755 and told her that he had only married Lilia to gain permanent resident status. This conversation occurred after Jorge had moved out.
Shortly after the parties separated, an attempt was made to reach an agreement with Jorge as to the disposition of assets. Lilia has a real estate broker's license and she and Jorge had worked together in the realty business during their marriage. Lilia's attorney prepared a proposed settlement agreement listing five parcels of real property as community property, and three as Lilia's separate property. Lilia offered Jorge one of the properties, but he declined. He then filed a petition for dissolution of the marriage on April 21, 2005.
On June 22, 2005, Lilia filed a response to the petition and a request for a judgment of nullity of marriage. At the bifurcated trial relating to the status of the marriage, Jorge demonstrated he had obtained his permanent resident status in 2002. He denied having a relationship with Blanca, although several telephone messages left on Blanca's cell phone and retrieved by a close family friend of Blanca and Liliain addition to the conversation overheard by Liliabelied his protestations.
The trial court concluded the 1999 marriage was void under the laws of Mexico and neither spouse was a putative spouse since neither acted in good faith. Although Lilia denied it, the court found she was likely the party who made the wedding arrangements since her family is from Jalisco, the ceremony was performed by an official from Jalisco, and the marriage certificate was issued by the State of Jalisco.
The court also found the second marriage was void because Jorge perpetrated a fraud on Lilia by carrying on an extramarital affair with Blanca. The court found that Jorge did not marry Lilia because he was worried about his immigration or work status; instead, the court found Jorge made false statements to Blanca about his reasons for marrying Lilia, including a need for a green card, to string her along and to delay having to make a commitment to her. Thus, the fraud related to Jorge's marrying Lilia while carrying on a sexual relationship with Blanca which he intended to maintain. The court concluded Jorge wanted to "have his cake and eat it too" by carrying on sexual relationships with both women at the same time.
*756 The trial court held that this kind of fraud goes to the heart of the marital relationship and declared the 2001 marriage void on the ground of fraud. (Fam. Code, § 2210, subd. (d).) The court also found Lilia was a putative spouse, for purposes of making a division of property at a subsequent proceeding. Jorge appeals.

DISCUSSION
Jorge contends (1) that he held a good faith belief in the validity of the 1999 marriage and should have been deemed a putative spouse of that marriage, and (2) his extramarital affair did not constitute fraud such as would render the 2001 marriage void. We review the judgment of nullity or a decision regarding the validity of a marriage under the substantial evidence standard of review. (In re Marriage of Liu (1987) 197 Cal.App.3d 143, 155 [242 Cal.Rptr. 649].)

A. The 1999 Marriage

(1) First we address Jorge's contention that he should have been deemed a putative spouse of the 1999 marriage. An innocent party to an invalid marriage may obtain relief as a putative spouse if the party believed in good faith that the marriage was valid. (Estate of DePasse (2002) 97 Cal.App.4th 92, 107 [118 Cal.Rptr.2d 143]; see also Fam. Code, § 2251, subd. (a)(1).) A putative spouse is entitled to the division of property acquired during the union as community property or quasi-community property. (DePasse, supra, at p. 107; Fam. Code, § 2251, subd. (a)(2).) The determination of the party's good faith is tested by an objective standard. (DePasse, supra, at pp. 107-108; Centinela Hospital Medical Center v. Superior Court (1989) 215 Cal.App.3d 971, 975 [263 Cal.Rptr. 672].) A subjective good faith belief alone, even by a party that is found credible and sympathetic, is insufficient. (Welch v. State of California (2000) 83 Cal.App.4th 1374, 1378 [100 Cal.Rptr.2d 430].) Instead, under an objective standard, a claim of putative spouse status must be based on facts that would cause a reasonable person to believe in good faith that he or she was married and that the marriage was valid under California law. (DePasse, supra, at p. 108; In re Marriage of Vryonis (1988) 202 Cal.App.3d 712, 721, 722-723 [248 Cal.Rptr. 807].)
Here, regardless of whether Jorge subjectively believed the 1999 marriage was valid, a reasonable person would not have. The marriage was performed in Moreno Valley, California, by a priest or other official from the State of Jalisco, Mexico. The official issued an "Acta de Matrimonio," a marriage *757 license, stating that the wedding was performed in Jalisco. This in itself is enough to put a reasonable person on notice that the marriage license, and hence the marriage itself, was not valid. Thus, we hold that Jorge was not a putative spouse as to the 1999 marriage.

B. The 2001 Marriage

(2) A marriage is voidable and may be adjudged a nullity if the consent of either party was obtained by fraud. (Fam. Code, § 2210, subd. (d).) A marriage may be annulled for fraud only in an extreme case where the particular fraud goes to the very essence of the marriage relation. (In re Marriage of Meagher & Maleki (2005) 131 Cal.App.4th 1, 3 [31 Cal.Rptr.3d 663] (Meagher).) The fact represented or suppressed to induce consent to marriage will be deemed material if it relates to a matter of substance and directly affects the purpose of the party deceived in entering the marital contract. (Handley v. Handley (1960) 179 Cal.App.2d 742, 746 [3 Cal.Rptr. 910].) In other words, the fraud relied upon must be such as directly defeats the marriage relationship and not merely such fraud as would be sufficient to rescind an ordinary civil contract. (Meagher, supra, at pp. 6-7; Williams v. Williams (1960) 178 Cal.App.2d 522, 525 [3 Cal.Rptr. 59].) Fraudulent intent not to perform a duty vital to the marriage state must exist in the offending spouse's mind at the moment the marriage contract is made. (Bruce v. Bruce (1945) 71 Cal.App.2d 641, 644 [163 P.2d 95].)
(3) A promise to be a kind, dutiful and affectionate spouse cannot be made the basis of an annulment. (Marshall v. Marshall (1931) 212 Cal. 736, 739-740 [300 P. 816].) Instead, the particular fraudulent intention must relate to the sexual or procreative aspects of marriage. In the absence of this type of fraud, the long-standing rule is that neither party may question the validity of the marriage upon the ground of express or implied representations of the other with respect to such matters as character, habits, chastity, business or social standing, financial worth or prospects, or matters of a similar nature. (Meagher, supra, 131 Cal.App.4th at p. 8.) Concealment of incontinence, temper, idleness, extravagance, coldness or lack of represented fortune will not justify an annulment. (Marshall, supra, at p. 740.)
(4) Other decisions demonstrate that to void a marriage, the fraud alleged must show an intention not to perform a duty vital to the marriage, which exists in the mind of the offending spouse at the time of marriage. (Millar v. Millar (1917) 175 Cal. 797 [167 P. 394] [wife concealed from husband at time of marriage that she did not intend to have sexual relations with him]; Hardesty v. Hardesty (1924) 193 Cal. 330 [223 P. 951] [wife concealed from husband at time of marriage that she was pregnant by another man]; Vileta v. Vileta (1942) 53 Cal.App.2d 794 [128 P.2d 376] [spouse concealed from *758 other spouse known fact of sterility at time of marriage]; In re Marriage of Liu, supra, 197 Cal.App.3d 143 [wife married husband in Taiwan to acquire a green card, and never consummated the marriage].) Thus, historically, annulments based on fraud have only been granted in cases where the fraud relates in some way to the sexual, procreative or child-rearing aspects of marriage. (Meagher, supra, 131 Cal.App.4th at pp. 7-8.)
Here, the trial court specifically found that the fraud was unrelated to the husband's efforts to obtain permanent legal status. Instead, it found the fraud was based on Jorge's intent to continue the ongoing simultaneous sexual relationships with Lilia and Blanca at the time that he and Lilia entered into the 2001 marriage.
In rendering its judgment of nullity, the trial court relied on the decision in Schaub v. Schaub (1945) 71 Cal.App.2d 467 [162 P.2d 966] (Schaub). In that case, a younger woman married an older man to obtain his real property. She had been involved in an intimate relationship with another man for many years, and conspired with her lover to marry the husband, with no intention of fulfilling the obligation of marriage to consummate the marriage. (Id. at pp. 469-470.) This she did, while continuing her sexual relationship with her lover. (Id. at p. 470.) The fraud was discovered when an investigator, hired by the husband, found the wife in bed with her lover, both naked. (Id. at pp. 472-473.)
We read Schaub as not standing solely on the intent not to consummate. Schaub does not at any point suggest that the intent not to consummate is the indicator of fraud. Neither does Schaub anywhere indicate that the intent to continue an existing relationship with a third party is enough for a finding of fraud only when accompanied by the intent not to consummate.
Further, the court in Schaub points out that "The marriage in itself was a contract under which each of the parties undertook the obligations of mutual respect, fidelity and support [citing Civ. Code, former § 155]."[2] (Schaub, supra, 71 Cal.App.2d at p. 474, italics added.) The Schaub court then concludes that the fraud consisted of the wife's intention not to perform her marriage obligations, including the obligation of fidelity, and the concealment of that from the innocent spouse. (Schaub, supra, at pp. 474-475.) That is just what happened here. At the time he entered into the 2001 marriage, Jorge manifestly intended not to perform his marriage obligation of fidelity. That is fraud under Family Code sections 720 and 2210, subdivision (d).
*759 Bolstering this interpretation of Schaub, the court in Meagher in fact refers to Schaub as justifying annulment where one party simply has the "intent to continue in an intimate relationship with a third person." (Meagher, supra, 131 Cal.App.4th at p. 7.) That describes exactly Jorge's intent and actions at the time he and Lilia married in 2001.
(5) Finally, as stated above, historically, annulments based on fraud have only been granted in cases where the fraud relates in some way to the sexual, procreative or child-rearing aspects of marriage. (Meagher, supra, 131 Cal.App.4th at pp. 7-8.) Jorge's actions here, in marrying Lilia while continuing to carry on a sexual relationship with her sister Blanca, directly relates to a sexual aspect of marriagesexual fidelity. For emphasis, we again quote from Family Code section 720: "Husband and wife contract toward each other obligations of mutual respect, fidelity, and support." At the time of the 2001 marriage, Jorge purposely deceived Lilia into thinking that he would perform one of the central obligations of the marriage contractthe obligation of fidelity. Under Family Code sections 720 and 2210, subdivision (d), and under Schaub and Meagher, Jorge committed fraud and Lilia is entitled to a judgment of annulment.

DISPOSITION
The judgment is affirmed. Jorge is directed to pay costs on appeal.
Richli J., concurred.
GAUT, J., Concurring.
I concur with the portion of the decision relating to the nullity of the 1999 marriage. However, regarding the nullity of the 2001 marriage, I dissent. I would reverse the judgment annulling the marriage and direct the entry of a judgment of dissolution of marriage.
The majority holds that infidelity alone, disdainful as it may be, may serve as a basis for annulment on the ground of fraud, relying upon the case of Schaub v. Schaub (1945) 71 Cal.App.2d 467 [162 P.2d 966]. That case involved a plot by a woman and her longtime lover to cheat an unsuspecting older gentleman out of a half-interest in his real property, while the wife maintained illicit extramarital relations with her lover.
In the 63 years since the Schaub case was decided, it has never been cited, until today, for the proposition that the infidelity of a spouse, without more, constitutes a fraud which justifies an annulment. Today's decision could have unintended repercussions in family law practice, leading to unnecessary litigation over title to property acquired by spouses during marriage which may not be considered community property if the marriage is deemed a nullity.
*760 I would reverse the judgment of nullity of marriage and order the entry of a judgment of dissolution of marriage. Annulment should be the exception, not the rule.
NOTES
[1] We will refer to the parties by their first names for purposes of clarity and not out of disrespect. (Rubenstein v. Rubenstein (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707], and cases cited therein.)
[2] The language of Civil Code former section 155 is now found at Family Code section 720: "Husband and wife contract toward each other obligations of mutual respect, fidelity, and support."