Filed 9/24/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of CAROLYN GOODWIN-MITCHELL and MICHAEL MITCHELL. | |
| CAROLYN GOODWIN-MITCHELL,<br><br>        Respondent,<br><br>v.<br><br>MICHAEL MITCHELL,<br><br>        Appellant. | A154915<br><br>(Alameda County<br>Super. Ct. No. HF17862586) |

Michael Mitchell appeals from a judgment annulling his marriage to Carolyn Goodwin-Mitchell.[1]  Uncontradicted evidence shows that Carolyn did not prove the requirements for annulment under Family Code section 2210, subdivision (d),[2] so we reverse the judgment.

## BACKGROUND

In June 2017, Carolyn filed a petition for nullity or, in the alternative, dissolution of the parties' marriage on the basis of fraud.  Both parties appeared in pro per and testified at the one-day evidentiary hearing.

---

[1] We refer to the parties by their first names to avoid any confusion from the similarity of their surnames.  We intend no disrespect by this practice.

[2] Further statutory citations are to the Family Code.

1

## *Carolyn's Testimony*

Before she met Michael, Carolyn helped obtain a green card for her Jamaican first husband. That marriage ended in divorce.

Michael is also from Jamaica. In January 2015, Carolyn met him online and they began dating over the internet. Michael started discussing marriage in February or March. Around the same time, he told Carolyn he wanted to move to the United States so that he could live with her, start a restaurant business, and join the U.S. army. In June 2015, Carolyn went to Jamaica and met Michael for the first time. The couple married during that visit.

Carolyn returned home and applied for a two-year conditional visa for Michael. The visa was approved in September 2016. In November 2016, Michael flew to the United States and moved in with Carolyn.

Within a week of Michael's arrival, he "was soliciting call girls, prostitution, and other women off of sites." In February 2017, he was jailed for a day and a half and a restraining order was issued after an incident of domestic violence between the parties.[3] While he was in jail, Carolyn discovered text messages to his mother in Jamaica on his phone. Michael wrote, "Me na lef, me na lef til me get my rass papers" and "Cody n u affi fuck reach." Carolyn interpreted these to mean Michael was "not leaving [Carolyn's] house until he gets his papers, and "his brother and his mom has to reach the United States." Carolyn also found extensive text messages between Michael and DeAndra. From the nature of the messages, Carolyn believed DeAndra to be Michael's girlfriend. Michael repeatedly told DeAndra he loved her. He wrote, "Wife call police how I hit her[.] [¶] Pure fuckery" and that he was "[j]ust waiting for army to come through[.]" Referring to Carolyn, he wrote, "By right she should treat me better but immigration will look at it n I can get divorce quicker [¶] . . . [¶] I have rights to here as she signed for it[.] [¶] . . . [¶] If I left immigration gonna be after me. . . [¶] Just waiting papers then I can move[.]" DeAndra urged Michael to leave Carolyn. He responded,

---

[3] Michael testified he entered a no contest plea and was released on probation.

"Am here soon move out.  Just waiting on my papers ok[.]  [¶] . . . [¶]  If I [move] I'll av to marry some one else."

The restraining order was lifted not long after Michael was released from jail. Michael moved back in with Carolyn.  According to Carolyn, this was because Michael had nowhere to go and she believed she was legally responsible for him until he obtained permanent resident status.  The couple continued their sexual relationship, but they "did not act as a couple to other people."

In March 2017, Michael had sex with another woman in Carolyn's home.  In June Carolyn filed divorce papers.  Nonetheless, the couple continued to live together and maintained their sexual relationship until November, when Michael's temper worsened, and Carolyn asked him to move out.  Michael complied.

### Michael's Testimony

Michael and Carolyn fell in love after internet dating for two months.  Carolyn filed a petition enabling him to come to the United States, but his permission to remain was conditioned on staying married for two years.

Michael denied soliciting women for sexual relations after his arrival.  He had one friend in the bay area, DeAndra, whom he knew "from a friend from Jamaica."  They were friends "up to the point until I got [to the United States]."  When Michael texted DeAndra about having to marry someone else, he meant Carolyn would report him to immigration authorities if he moved out, and he would be deported unless he remarried.

Michael came to the United States to be with Carolyn, have a family, open a restaurant and join the military.  He did not return to Jamaica when his relationship with Carolyn started to fall apart because he was on probation and feared extradition if he left the country without resolving his legal problems.

Michael's relationship with DeAndra was not sexual.  They met in Jamaica through his aunt in late 2015 or early 2016, after Michael and Carolyn were married, but DeAndra lived in a different part of the island.  They "used to text as friends but it was nothing."  Carolyn took his phone two weeks after he came back, not while he was in jail, and the texts she found on it were written after his release.  He told DeAndra he loved her

only because he was "deeply hurt" and "seeking comfort, because I was torn. I was traumatized because I went to jail. I was torn. I was just looking for love."

### Carolyn's Further Testimony

Carolyn disputed Michael's denial of having sex with other women during their marriage. In March 2017, she recorded audio of him having sex with another woman in their home.[4] Describing the recording, she testified "The audio told me that he invited this woman into my home. He was giving her directions there. Shortly upon her arriving they were in the living room talking and it got really quiet. After that, you could hear sexual contact, kissing, and after that you could hear full-blown on sexual misconduct or conduct I'm sorry. [¶] . . . [¶] It started in the living room. And they moved to my bed." Carolyn later found the woman's phone number on Michael's phone and spoke with her. Carolyn believed Michael was also soliciting other women because other numbers on his phone belonged to "[e]scort lines, all that type of stuff."

### Michael's Further Testimony

Michael remained adamant that he did not have sexual relations with other women during the marriage. Carolyn's testimony about taping a sexual encounter was a lie. Kim, the woman in question, was an acquaintance who stopped by the house not long after Michael's arrest. She "started to kiss on my neck, and started commanding sexual favors. . . and started like playing with herself, and was just carrying on." Michael "asked her to leave, and she was like you know, let's just take care of business." He touched her breast but did not have sex with her. It was Kim, not Carolyn, who recorded the incident, "[b]ecause she wanted sexual favors" from Michael.

### The Court's Ruling

The court stated its decision from the bench as follows. "The Court heard testimony from both parties with respect to the marriage that took place in June of 2015

---

[4] Carolyn said she had the audio recording with her in court, but it was not played or entered into evidence. The court excluded from evidence an unsigned handwritten letter from the woman in question purportedly describing the incident and a March 2018 e-mail exchange between Michael and an immigration attorney.

when the parties married in Jamaica. After the marriage was concluded, [Carolyn] made a request of the U.S. Immigration Department to . . . for [Michael] to be authorized to come to the United States, and that petition was approved in September 2016.

". . . [Michael] came to the United States after receiving that approval in November of 2016.

"Upon arriving to [*sic*] the United States, there was an incident of domestic violence between the parties in February 2017. [Michael] testified that he pled no contest and was placed on probation, and also ordered to complete certain courses.

"[Michael] stayed with his wife . . . for some weeks after he was released from jail. [¶] . . . [¶] Therefore [*sic*], while the parties continued to live together, [Michael] admitted that he did have another physical relationship with another woman in March of 2017. And he also admitted at trial that he had a relationship with another second woman; however, that relationship was not physical in nature.

"He did testify, as noted in Exhibit 1, that he professed his love for this other woman who was living in Jamaica, who he met in Jamaica.

"Although the Court notes that his testimony was that he had conveyed his love to this second woman because he claimed he was traumatized from having gone to jail on the DV allegations, nevertheless, the Court finds that shortly after, within one year or less of coming to the U.S., he engaged in two relationships with women external to his marriage. And the law is clear that a spouse is entitled to more than mere cohabitation with the other, and that the spouses owe one another a duty of fidelity and duty to live with one another wholly and maintaining that confidence with one another throughout the time of their marriage.

"The Court does not find that to be the case here, and therefore the Court is going to grant [Carolyn's] Petition for Nullity. And that is the Court's order."

Michael filed a timely appeal from the ensuing judgment.

## DISCUSSION

### I. *Legal Principles*

Section 2210, subdivision (d) provides a marriage may be adjudged a nullity if "[t]he consent of either party was obtained by fraud, unless the party whose consent was obtained by fraud afterwards, with full knowledge of the facts constituting the fraud, freely cohabited with the other as his or her spouse." "A marriage may be annulled for fraud only in an extreme case where the particular fraud goes to the very essence of the marriage relation. [Citation.] The fact represented or suppressed to induce consent to marriage will be deemed material if it relates to a matter of substance and directly affects the purpose of the party deceived in entering the marital contract. [Citation.] In other words, the fraud relied upon must be such as directly defeats the marriage relationship and not merely such fraud as would be sufficient to rescind an ordinary civil contract. [Citations.] Fraudulent intent not to perform a duty vital to the marriage state must exist in the offending spouse's mind at the moment the marriage contract is made." (*In re Marriage of Ramirez* (2008) 165 Cal.App.4th 751, 757 (*Ramirez*), disapproved on another point in *Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1126.)

Thus, a fraudulent intent to stray from the marital bed may be sufficient for annulment if the offending spouse held that intent at the time he or she entered into the marriage. (*Ramirez, supra*, 165 Cal.App.4th at p. 757 [husband married wife while intending to continue his existing sexual relationship with wife's sister]; *Schaub v. Schaub* (1945) 71 Cal.App.2d 467, 475 (*Schaub*) [wife married husband intending to continue sexual relationship with another man].) A concealed intent to marry solely to obtain favorable immigration status will also support annulment. (*In re Marriage of Rabie* (1974) 40 Cal.App.3d 917, 922-923 [husband induced wife to marry him solely to acquire green card and never intended to remain faithful or stay married]; *In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 156 [wife entered marriage to obtain a green card and did not intend to consummate the marriage].) Because public policy strongly favors marriage, the fraud must be shown by clear and convincing evidence. (*Williams v. Williams* (1960) 178 Cal.App.2d 522, 525.)

6

Courts typically review such findings for substantial evidence. (*Ramirez*, *supra*, 165 Cal.App.4th at p. 756; see *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881 [substantial evidence review applies in appeal from judgment required to be based on clear and convincing evidence].) "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics omitted.) But where the facts are undisputed, application of section 2210 to those facts presents a pure question of law subject to de novo review. (*In re Marriage of Seaton* (2011) 200 Cal.App.4th 800, 806.)

## II. *Analysis*

Michael contends the court erred when it granted Carolyn's petition for annulment because the couple continued to cohabit long after Carolyn discovered his infidelity. We must agree. Section 2210, subdivision (d) is clear on this point. "A marriage is voidable and may be adjudged a nullity if [¶] . . . [¶] the consent of either party was obtained by fraud, *unless the party whose consent was obtained by fraud afterwards, and with full knowledge of the facts constituting the fraud, freely cohabited with the other as his or her spouse*." (Italics added.) Here, Carolyn discovered Michael's communications with DeAndra in February or March of 2017. She taped Michael's sexual encounter with Kim in March. Nonetheless, the parties continued to live together and to have sexual relations for another eight months. On this record, the court could not issue a judgment of nullity under section 2210, subdivision (d). "[I]f the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs." (*People v. Walker* (2002) 29 Cal.4th 577, 581.) Even were we to believe the

7

statute is outmoded and to disagree with the policies that presumably underlie it, our decision is mandated by the clear statutory language.  Such policy determinations and changes to California's existing statutory law are matters for the Legislature, not the courts.  (See *In re M.C.* (2011) 195 Cal.App.4th 197, 213-214, superseded by statute on other grounds as stated in *In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1090.)

The judgment of nullity must therefore be reversed.  In light of this disposition, we will not address whether the evidence was sufficient to establish that Michael intended not to perform his duty of marital fidelity when he married Carolyn in June 2015, or that he married her only to emigrate to the United States.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court for proceedings on Carolyn's alternative petition for dissolution.

_____
Siggins, P.J.

WE CONCUR:


_____
Petrou, J.


_____
Wick, J.*

*Goodwin-Mitchell v. Mitchell*, A154915

* Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9

Trial Court:                                    Alameda County Superior Court


Trial Judge:                                    Honorable Lupe C. Garcia

Counsel:

Kathleen L. Morgan for Appellant.