[No. C067715. Third Dist. Aug. 31, 2012.]

JOHN P. BURNHAM et al., Plaintiffs and Respondents, v.
PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Defendant and
Respondent;
KATHLEEN S. HONEYMAN, Real Party in Interest and Appellant.

COUNSEL

Stephanie J. Finelli for Real Party in Interest and Appellant.

Peter H. Mixon and Henry W. Crowle for Defendant and Respondent.

Griswold, LaSalle, Cobb, Dowd & Gin and Robin M. Hall for Plaintiffs and Respondents.

OPINION

**ROBIE, J.**—This case is about the procedures two individuals must follow to become domestic partners under California law.

James Burnham (Burnham) and real party in interest Kathleen S. Honeyman (Honeyman) wanted to become domestic partners. On a Saturday morning, they completed a notarized declaration of domestic partnership. Later that afternoon, Burnham died. The following Monday, Honeyman presented the declaration to the office of the Secretary of State, and the clerk filed it.

Thereafter, Honeyman applied for Burnham's state pension survivor benefits. The administrative board of the state pension system ruled Honeyman was entitled to the benefits, but the trial court held she was not because Honeyman and Burnham were not domestic partners at the time he died. The trial court got it right.

The Legislature by statute has enumerated the requirements for establishing a domestic partnership. The statute states in relevant part, "A domestic partnership shall be established in California when both persons file a Declaration of Domestic Partnership with the Secretary of State . . . , and, at the time of filing . . . [¶] . . . [¶] . . . [b]oth persons are capable of consenting to the domestic partnership." (Fam. Code,[1] § 297, subd. (b).)

Consistent with the language of the statute, we hold that presenting a declaration of domestic partnership for filing with the Secretary of State is a necessary prerequisite for a valid domestic partnership, and at the time of presentation, both individuals to the partnership must be capable of consenting.

---

[1] Further section references are to the Family Code.

Here, because Burnham was deceased when Honeyman presented the declaration of domestic partnership for filing with the Secretary of State, Honeyman and Burnham never became domestic partners. Therefore, Honeyman was not entitled to Burnham's state pension survivor benefits.

## FACTUAL AND PROCEDURAL BACKGROUND

Burnham became a member of California's Public Employees' Retirement System (CalPERS) in 1967. He designated his then wife as his primary beneficiary and his four children, including two of whom are plaintiffs here (John P. Burnham and James Burnham II) as his secondary beneficiaries. Burnham and his wife later divorced.

After the divorce, Burnham and Honeyman began living together in 1969. Nine years later, Burnham changed his CalPERS primary beneficiary designation to Honeyman. In the change of beneficiary form, Honeyman was listed as Burnham's "friend."

Burnham developed bone-metastasized prostate cancer in 2006. In May, Burnham filed a service retirement election application in which he designated the "Estate of James E. Burnham" as his beneficiary. In July, Burnham retired.

Burnham became extremely ill by October 2007. Honeyman had been caring for him while she was working, but Burnham needed full-time care due to the severity of his illness. They both realized Honeyman could take time off work if the two were spouses or domestic partners. So about a week before Burnham ended up dying, Honeyman and Burnham decided to become domestic partners. Burnham and Honeyman signed the declaration of domestic partnership in their house at approximately 9:00 a.m. on Saturday, October 27, 2007, in front of a notary. At 4:30 p.m. Burnham died. He was 67 years old.

The following Monday, October 29, 2007, Honeyman hand delivered the declaration of domestic partnership to the Secretary of State's office in Fresno. The clerk filed it and the Secretary of State issued Burnham and Honeyman a certificate of registered domestic partnership dated October 29, 2007.

Honeyman applied for Burnham's state pension survivor benefits, which totaled approximately $100,000. CalPERS staff denied her application, reasoning she and Burnham were not registered domestic partners at the time Burnham died. It determined the benefits were properly payable to Burnham's surviving children as Burnham's intestate heirs. Honeyman appealed the CalPERS staff's denial, but an administrative law judge (ALJ) issued a proposed ruling in favor of the CalPERS staff's determination. The CalPERS Board of Administration (the CalPERS board) voted not to adopt the ALJ's proposed ruling and instead decided the matter itself. The CalPERS board decided Honeyman was entitled to the benefits under a putative spouse theory, reasoning Honeyman had a "reasonable good faith belief that registration of the Declaration of Domestic Partnership had validly taken place."

Two of Burnham's children—plaintiffs John Burnham and James Burnham II—filed a petition for writ of administrative mandamus challenging the CalPERS board's determination. The trial court granted the writ. In a well-reasoned and thoughtful opinion, the trial court explained Honeyman and Burnham were not domestic partners because Burnham was dead at the time Honeyman filed the declaration, the putative spouse doctrine did not apply because that doctrine protects the expectation of parties who accumulate property over time believing they are part of a valid union, which is not what happened here, and the law as applied did not violate equal protection principles.

Honeyman appeals from the resulting judgment. She contends the trial court erred in concluding she and Burnham were not domestic partners at the time he died, erred in refusing to apply the putative spouse doctrine, and erred in concluding the law as applied here did not violate state equal protection principles. CalPERS, which appears as respondent, joins in Honeyman's arguments. We address each of these arguments after pausing for a short history of opposite-sex domestic partnerships in California.

## DISCUSSION

### I

### A  Short History of Opposite-sex Domestic Partnerships in California

In 1999, the California Legislature enacted and the Governor signed into law the state's first domestic partnership statutes. (Stats. 1999, ch. 588, § 2, p. 4157, adding Fam. Code, §§ 297–299.6.) As enacted, the legislation

allowed two types of couples to become domestic partners—(1) same-sex couples where both individuals were at least 18 years old and (2) opposite-sex couples where both individuals were over 62 years old and met certain criteria under the Social Security Act (42 U.S.C. § 301 et seq.). (Former § 297, subd. (b)(6)(A) & (B), added by Stats. 1999, ch. 588, § 2, p. 4157.) As introduced, the bill did not distinguish between same-sex or opposite-sex couples and allowed either to enter into domestic partnerships if the individuals to the partnership were at least 18 years old (and met certain other requirements). (Assem. Bill No. 26 (1999–2000 Reg. Sess.) as introduced Dec. 7, 1998.) The opposite-sex couples were later carved out as a special category in the domestic partnership legislation because "many would not, or could not, marry due to restrictions on social security or other pension benefits that would affect their incomes." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 26 (1999–2000 Reg. Sess.) as amended Sept. 3, 1999, p. 10.)

In 2001, the Legislature expanded the class of individuals who may establish domestic partnerships by providing that persons of opposite sex may establish a domestic partnership if one or both of them were over the age of 62 and one or both of them met certain criteria under the Social Security Act. (Stats. 2001, ch. 893, § 3, p. 7284, amending Fam. Code, § 297, subd. (b)(6)(B).)

With this background of the history of opposite-sex domestic partnerships in mind, we turn to the issues raised here.

## II

### A   *Valid Domestic Partnership Requires the Parties to File a Declaration of Domestic Partnership*

Honeyman contends the court erred in concluding she and Burnham were not domestic partners at the time he died. She bases her contention on the view that filing the declaration of domestic partnership is a ministerial act akin to filing a marriage certificate, and it is completing the notarized declaration that is the required act, akin to solemnizing a marriage.

■   We begin with the statutory language. The proper interpretation of a statute, and its application to undisputed facts, is a question of law that we review de novo. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 722 [39 Cal.Rptr.3d 189].) In this de novo review, " ' "[o]ur fundamental task . . . is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning.

[Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.]" ' " (*California Forestry Assn. v. California Fish & Game Commission* (2007) 156 Cal.App.4th 1535, 1544–1545 [68 Cal.Rptr.3d 391].)

■ "A domestic partnership shall be established in California when both persons file a Declaration of Domestic Partnership with the Secretary of State . . . , and, at the time of filing, all of the following requirements are met: [¶] (1) Neither person is married to someone else or is a member of another domestic partnership . . . . [¶] (2) The two persons are not related by blood . . . . [¶] (3) Both persons are at least 18 years of age . . . . [¶] (4) Either of the following: [¶] (A) Both persons are members of the same sex. [¶] (B) One or both of the persons meet the eligibility criteria under . . . the Social Security Act . . . [and] one or both of the persons are over 62 years of age. [¶] (5) Both persons are capable of consenting to the domestic partnership." (§ 297, subd. (b).) Use of the term "shall" in the Family Code means the required action is mandatory. (§ 12.)   **(3)**   From the plain language of section 297, the Legislature has made clear that to "establish" a domestic partnership, a declaration of domestic partnership must be filed with the Secretary of State and at the time of filing, the two people entering into the domestic partnership must be capable of consenting to the partnership.[2] Since those two people must be able to consent at the time of filing, it follows those two people must be alive at the time of filing.[3]

Despite this plain statutory language, Honeyman argues that filing the declaration is a ministerial act over which she had no control, and she and Burnham took what she considers the only necessary act for forming a valid domestic partnership—completing a notarized declaration of domestic partnership.[4] Honeyman's argument overlooks a critical point.

---

[2] Because the plain language of the statute requires filing of the declaration to establish a domestic partnership, we reject CalPERS's argument we should afford great weight and deference to their contrary interpretation of the statute.

[3] Section 297 was amended in 2003 to add the language "both persons file a Declaration of Domestic Partnership with the Secretary of State . . . , and, at the time of filing, all of the following requirements are met . . . ." (Stats. 2003, ch. 421, § 3, p. 3082.) Our review of the legislative history of this amendment sheds no light on why this amendment was made.

In a later code section there is language stating, "Two persons desiring to become domestic partners may complete and file a Declaration of Domestic Partnership with the Secretary of State." (§ 298.5, subd. (a).) This language, however, appears in a code section having to do with registering and terminating a domestic partnership and contains no directives on how to effectuate a valid domestic partnership. (§ 298.5.) Those directives can be found in section 297, which contains the requirement the declaration must be filed.

[4] In making this argument, Honeyman contends that had she mailed the declaration to the Secretary of State on Saturday, the date of mailing would have sufficed as the date of filing, which in her view underscores the proposition that filing the declaration was a ministerial act

■ There are *two* steps in filing. One, the parties relinquish control of the declaration. And two, the clerk receives the declaration and files it. Here, the statute speaks in terms of "both persons fil[ing] a Declaration of Domestic Partnership with the Secretary of State." (§ 297, subd. (b).) Obviously, it is not the parties who file the declaration, it is the clerk. To give the term "filing" meaning here, "filing" refers to the act of both parties to the domestic partnership relinquishing control of the declaration for filing by the clerk. It is the act of relinquishing control of the declaration to the clerk that is the operative act because it symbolizes a decision by both parties to the union to go through with the domestic partnership. It is the point at which the parties can no longer change their minds about their decision.

With this understanding of the nature of filing in mind, we turn to its relationship to marriage. Contrary to Honeyman's argument, it is both parties' obtaining a notarized declaration that is analogous to obtaining a marriage license and it is both parties' filing the declaration that is analogous to solemnizing a marriage. We explain.

Prior to having a marriage solemnized, the parties must obtain a marriage license. (*Estate of DePasse* (2002) 97 Cal.App.4th 92, 103 [118 Cal.Rptr.2d 143].) To obtain a marriage license, the parties first must appear together in person before the county clerk. (§§ 350, 359, subd. (a).) The clerk cannot grant the license if either party "lacks the capacity to enter into a valid marriage or is . . . under the influence of an intoxicating liquor or narcotic drug." (§ 352.)

■ Similar to parties to a marriage obtaining a license, parties to a domestic partnership must obtain a notarized declaration of domestic partnership. The parties first must obtain a declaration of domestic partnership, which is available at the Office of the Secretary of State and from each county clerk. (§ 298, subd. (b)(1).) The parties then must complete the declaration, sign it, and have a notary acknowledge their signatures. (§ 298, subds. (a), (b)(1).) At the time the declaration is completed and filed, the parties must be capable of consenting to the domestic partnership. (§ 297, subd. (b)(5).)

Boiled down to its essence, then, it is the step of either obtaining a license in the case of a marriage or obtaining a notarized declaration in the case of a domestic partnership that is the essential paperwork to get to the point where each party to the union can say "I do," either literally or by action. We explain that step next.

that could have been performed after Burnham's death. We need not decide what constitutes the day of filing when a declaration is mailed to the Secretary of State because that is not what happened here.

Obtaining a license or a notarized declaration is an essential but ineffective step by itself to make a marriage or domestic partnership valid. Rather, it is the necessary step of solemnizing in the case of a marriage (*In re Marriage of Cantarella* (2011) 191 Cal.App.4th 916, 924 [119 Cal.Rptr.3d 829]) or filing in the case of a domestic partnership that makes each of these unions valid. Solemnizing a marriage is the act of "declar[ing], in the physical presence of the person solemnizing the marriage and necessary witnesses, that they take each other as husband and wife." (§ 420, subd. (a).) Filing the declaration, as we explained above, is the act of both parties to the domestic partnership relinquishing control of the declaration for filing by the clerk. What these acts have in common is they symbolize the irrevocable decision to go through with the union. In the case of solemnization, once the parties say "I do," they cannot take the statement back. In the case of filing, once the parties relinquish control of the declaration, they cannot take the document back. Simply put, in either case, it is the point in the process at which the parties can no longer change their minds about their decision to form a union.

■ Applying this understanding of the nature of filing here, we hold that because Honeyman did not present the declaration for filing before Burnham's death, they were not domestic partners.

### III

*The Putative Spouse Doctrine Does Not Apply Under the Facts Here*

Honeyman contends that regardless of whether she and Burnham were domestic partners at the time of his death, she was entitled to Burnham's survivor benefits under the putative spouse doctrine. As we explain below, the putative spouse doctrine does not apply under the facts here.

■ "The putative [spouse] doctrine operates to protect expectations in property acquired through the parties' joint efforts." (*Estate of DePasse, supra,* 97 Cal.App.4th at p. 108.) It is "an equitable doctrine first recognized by the judiciary . . . ." (*In re Domestic Partnership of Ellis & Arriaga* (2008) 162 Cal.App.4th 1000, 1005 [76 Cal.Rptr.3d 401].)

About a century ago, our Supreme Court explained the doctrine as follows: "where persons . . . , believing themselves to be lawfully married to each other, acquire property as the result of their joint efforts, they have impliedly adopted . . . the rule of an equal division of their acquisitions, and the

expectation of such a division should not be defeated in the case of innocent persons." (*Schneider v. Schneider* (1920) 183 Cal. 335, 339–340 [191 P. 533].) In *Schneider*, the "plaintiff at the time of her marriage to the defendant was the wife of another man, although at that time she was laboring under the belief that . . . in . . . 1905, her prior marriage had been dissolved. Her union to the defendant took place in 1908 and was entered into in good faith, and the parties thereafter lived together as husband and wife for about eight years, accumulating by their joint efforts certain property, a part of which, by the judgment in this case, was awarded to the plaintiff." (*Schneider*, at p. 336.) Our Supreme Court upheld the award of property to the plaintiff wife based on the notion of the parties' implied adoption of the rule of equal division of the property acquired as a result of their joint efforts. (*Schneider*, at pp. 339–340, 342.)

In upholding the award to the wife, the *Schneider* court explained in detail the facts of another case, *Coats v. Coats* (1911) 160 Cal. 671 [118 P. 441]. (*Schneider v. Schneider, supra*, 183 Cal. at p. 340.) *Coats* "was an action, after a decree of annulment, for a division of the property which had been accumulated by the parties after the marriage. It was held that a woman who in good faith had entered into a marriage which was subsequently annulled . . . was entitled to participate in the property which had been accumulated by the efforts of both parties during the existence of the abortive marriage. 'To say,' declare[d] the [*Coats*] court, 'that the woman in such case . . . is to receive nothing, while the man with whom she lived and labored in the belief that she was his wife shall take and hold whatever he and she have acquired, would be contrary to the most elementary conceptions of fairness and justice.' In [*Coats*] the [husband] argued that the marriage being voidable, the effect of the decree of annulment was to render the marriage void from the beginning, and that all property rights of either dependent upon the marriage were terminated and annulled. 'But,' said the [*Coats*] court, 'these decisions deal with the rights of one of the parties in property owned by the other. . . . Here, however, the controversy is a different one. The controversy is not over the property owned by the [husband] prior to the marriage, or acquired by him alone thereafter, but has to do with the acquisitions of the two parties after marriage and before annulment. . . . In the absence of fraud, or other ground affecting the right to claim relief, there can be no good reason for saying that either party should by reason of the annulment be vested with title to all the property acquired during the existence of the supposed marriage.['] And the [*Coats*] court proceed[ed] to hold that while, strictly speaking, there c[ould] be no community property in the absence of a valid marriage, courts will, in dividing gains made by the joint efforts of a man and woman living together under a voidable marriage

which is subsequently annulled, apply by analogy the rule which would obtain when a valid marriage is dissolved." (*Schneider*, at pp. 340–341, quoting *Coats*, at p. 676.)

The facts of *Schneider* and *Coats* demonstrate why the putative spouse doctrine is inapplicable here. In *Schneider* and *Coats*, the parties entered into seemingly valid unions and based on that understanding, they accumulated assets during those unions. In those situations, the courts applied the putative spouse doctrine to protect the innocent parties of invalid marriages from losing rights to what would have been community property acquired during the unions as the result of their joint efforts. Unlike those situations, Honeyman did not accumulate assets with Burnham during a seemingly valid domestic partnership and then attempt to invoke the putative spouse doctrine to protect her loss of those assets—assets that would have been community property if the marriage was valid. Rather, as the trial court aptly put it, Honeyman is attempting to use the doctrine "to look forward" to obtain rights upon Burnham's death without any "detriment[al] . . . reliance."[5] These facts distinguish this case from the putative spouse scenario, where the parties enter into what one or both believe is a valid union and *then* accumulate property only to learn the union was void or voidable.[6]

IV

*Honeyman Has Not Carried Her Burden of Showing She Is Entitled to the Remedy She Is Seeking for an Alleged Equal Protection Violation*

Honeyman contends the domestic partnership statutes as applied to her violate her rights under our state's equal protection clause (Cal. Const., art. I,

[5] The trial court noted the putative spouse doctrine might have applied if, for example, Honeyman and Burnham believed (although erroneously) they were domestic partners and then, in reliance on that belief, they decided they "d[id]n't need to do a will, [they] d[id]n't need to do a trust, [they] d[id]n't need to fill out the PERS' designation of a beneficiary" because they believed they had "accomplished all that by becoming domestic partners."

[6] Given our conclusion the putative spouse doctrine does not apply here, we do not address three other issues raised by Honeyman related to the putative spouse doctrine. The first is whether the putative spouse doctrine even applies to domestic partnerships. (Compare *In re Domestic Partnership of Ellis & Arriaga, supra*, 162 Cal.App.4th at p. 1008 [applying the doctrine to domestic partnerships] with *Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1173–1174 [48 Cal.Rptr.3d 642] [refusing to apply the doctrine to domestic partnerships].) The second is whether Honeyman's good faith belief she and Burnham were domestic partners at the time he died had to be an objectively reasonable belief for the doctrine to apply. (See *Ceja v. Rudolph & Sletten, Inc.*, review granted Aug. 10, 2011, S193493.) The third is whether the trial court applied the wrong standard in reviewing the CalPERS board's determination when the court concluded Honeyman did not have a reasonable good faith belief the domestic partnership was valid.

§ 7). In raising this contention, Honeyman necessarily acknowledges the Legislature is allowed to establish procedures (and not necessarily identical ones) for couples that want to enter into marriages or domestic partnerships. But, she argues that by "requiring [the] extra, ministerial step [of filing] following consent, licensing and solemnization of the domestic partnership," the statute violates equal protection of the law. An unusual feature of Honeyman's contention is the remedy she is seeking for the alleged equal protection violation—reinstatement of the decision of the CalPERS board to allow her to receive Burnham's CalPERS survivor benefits. As we explain, Honeyman's contention fails because she makes no effort to persuade us the remedy she is seeking is appropriate for an alleged equal protection violation.

■ If "a court concludes that a statutory classification violates the constitutional guarantee of equal protection of the laws, it has a choice of remedies." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1207 [39 Cal.Rptr.3d 821, 129 P.3d 29].) This can include, for example, withdrawing the treatment or benefits of a statute from the favored group or extending that treatment or benefits to the excluded class, or invalidating a statute or expanding its reach. (*Ibid.*) At least one court has held it cannot include a claim for damages. (See, e.g., *Gates v. Superior Court* (1995) 32 Cal.App.4th 481 [38 Cal.Rptr.2d 489].)

"In choosing the proper remedy for an equal protection violation, [the court's] primary concern is to ascertain, as best [it] can, which alternative the Legislature would prefer." (*People v. Hofsheier, supra,* 37 Cal.4th at p. 1207.) *Gates* illustrates a court's concern for ascertaining legislative intent in fashioning a remedy for an equal protection violation. In *Gates*, the plaintiffs "sought damages to remedy an asserted violation of their rights under the state equal protection clause (Cal. Const., art. I, § 7), based upon the allegedly discriminatory deployment of police protection during a riot. The court found that neither the language of the provision, nor the court's extensive review of the historical documents underlying the provision, revealed any intent to afford a damages remedy . . . and declined to allow such an action." (*Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 315 [127 Cal.Rptr.2d 482, 58 P.3d 339], citation & fn. omitted.)

Here, Honeyman makes no effort to demonstrate any intent on the part of the Legislature to afford the remedy she proposes for the alleged equal protection violation. As the appellant, she bears the burden of persuading us she is entitled to the remedy she seeks. We therefore conclude Honeyman has not established that her equal protection claim is capable, as a matter of law, of supporting a judgment for reinstating the decision of the CalPERS board to allow her to receive Burnham's CalPERS survivor benefits.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(2).)

Blease, Acting P. J., and Hull, J., concurred.